

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-6-2004

# Commerce Natl Ins v. Buchler

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1028

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Commerce Natl Ins v. Buchler" (2004). *2004 Decisions.* Paper 101.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/101

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-1028

———

COMMERCE NATIONAL INSURANCE SERVICES, INC.,

<u>Appellant</u>

v.

MICHAEL BUCHLER; NEW CASTLE INSURANCE LTD;
MARIANNE PISTORIA

———

On Appeal from the United States District Court for the District of Delaware
(District Court No. 02-cv-00037)
District Judge: Honorable Sue L. Robinson, Chief Judge

———

Submitted Under Third Circuit LAR 34.1(a): November 19, 2004

Before: SCIRICA, *Chief Judge*, and
MCKEE and CHERTOFF, *Circuit Judges*.

(Filed December 6, 2004)

———

OPINION

———

CHERTOFF, *Circuit Judge.*

Michael Buchler and Marianne Pistoria left Commerce National Insurance

Services (CNIS) to join a competing insurance brokerage firm, New Castle Insurance,

Ltd., in early 2002.  Buchler personally contacted many of his former CNIS clients to let

them know that he had moved to New Castle Insurance. New Castle Insurance also sent postcards to many of Buchler's former clients which announced Buchler's and Pistoria's arrival at the firm. CNIS sued Buchler, Pistoria, and New Castle for tortious interference with existing contracts and with prospective business relations and sued Buchler and Pistoria for breach of the nonsolicitation and confidentiality provisions in their employment contracts.[1]

CNIS filed this appeal from a December 10, 2003 Opinion and Order of the District Court granting summary judgment in favor of Buchler, Pistoria, and New Castle Insurance on the breach of contract and tortious interference claims in CNIS's Complaint. Each claim was based on an underlying allegation that Buchler and Pistoria had breached the terms of the nonsolicitation and confidentiality agreements in their employment contracts with CNIS. The District Court found that summary judgment was appropriate because CNIS had not established that Buchler's nonsolicitation agreement applied to his voluntary departure from CNIS, had not presented any evidence that Buchler violated the terms of his confidentiality agreement, and had not raised any factual issue regarding the propriety of Pistoria's actions. (App. 30-32.) The Court further found that the tortious interference claims failed as against Buchler, Pistoria and New Castle because CNIS's

---

[1] CNIS also brought a defamation claim against all three defendants and a conversion claim against Buchler. The District Court granted summary judgment in favor of the defendants on the defamation and conversion claims and CNIS has not appealed the Court's judgment as to these claims.

existing business clients were free "to choose their insurance representative" and because CNIS "failed to identify any prospective business relations that, but for defendants' conduct, would have become clients." (App. 33-34.)

This Court exercises plenary review over the District Court's decision. See Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 381 (3d Cir. 2004). We will affirm.

A.

The District Court first found that Buchler did not violate the terms of the non-solicitation agreement in section G.3 of his employment agreement because the provision applies only to involuntary termination situations. We agree.

Under Delaware law, the terms of a nonsolicitation agreement must be "read in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible." CTF Hotel Holdings, Inc. v. Marriott Int'l., Inc., 381 F.3d 131, 137 (3d Cir. 2004); Eugene A. Delle Donne and Son, L.P. v. Applied Card Sys., Inc., 821 A.2d 885, 887 (Del. 2003). If the language of the agreement is unambiguous, it must be given its plain meaning. If it is ambiguous, it must be construed against the drafter in accordance with the "well-accepted contra proferentem principle of construction." Twin City Fire Ins. Co. v. Del. Racing Assoc., 840 A.2d 624, 630 (Del. 2003).

Here, the Buchler nonsolicitation agreement, read as a whole, is ambiguous. Section G.3.A is expressly limited to involuntary termination situations, providing that the

3

employee is prohibited from providing notice to his former accounts "[f]or a period of 365 days following termination of 'Employee's' employment by 'Employer.'" (App. 57) (emphasis added). Section G.3.B does not include this "by employer" language, instead providing that "[f]or a period of 36 months following termination of employment, 'Employee' shall neither call upon or solicit, either for 'Employee' or for any other person or firm, any 'Class A, Class B, or Class C Accounts' . . ." (App. 57) (emphasis added). CNIS asserts that the absence of the "by employer" language in G.3.B requires its application to all termination situations, whether voluntary or involuntary. The court, though, must read the agreement as a whole, including the immediately subsequent "Post-termination Purchase of Accounts" paragraph, which further defines the positions of the parties in a section G.3.B situation and is expressly limited to involuntary termination situations. The paragraph provides, in pertinent part:

> "Employee" agrees that if, during the 36 month period following termination of employment by "Employer", an account which "Employee" is other wise not permitted to solicit pursuant to the provisions of Agreement G. of this . . . Cont[r]act, nevertheless places business through "Employee" either directly or with an entity with which "Employee" is affiliated or employed, "Employer" as fair compensation for such account an amount equal to the following:
> "Class A accounts":
> .50 times annualized gross commissions for 36 months after writing account.
> "Class B accounts":
> .50 times annualized gross commissions for 36 months after writing account.
> "Class C accounts":
> .50 times annualized gross commissions for 36 months after writing account.

(App. 57-58) (emphasis added).

The District Court read these two paragraphs together, and used the "termination

4

of employment by Employer" language in the "Post-termination Purchase of Accounts" paragraph to construe the "termination of employment" language in the immediately preceding section G.3.B. This reading is reasonable, as it provides double protection to the employer who fires an employee, first, by limiting the number of times where it will lose Class A, B, and C accounts by preventing the employee from soliciting them, and second, by providing for monetary relief should the accounts follow nonetheless. Had the employer also wished to protect itself in voluntary termination situations, it can be assumed that it would have provided for the same dual protection in G.3.B and the "Post-termination Purchase of Accounts" paragraph. It did not, as it explicitly limited the post-termination purchase protection to involuntary termination situations.

Therefore, because the agreement can reasonably be read to apply solely to involuntary termination situations, and because the Court must construe the clause against CNIS as drafter, this Court will affirm.

B.

Michael Buchler was also bound by a confidentiality agreement, under which he agreed that he would not use confidential information obtained at CNIS "for any purpose other than in the course of this employment and for the exclusive benefit of [CNIS]." (App. 55-56.) CNIS asserts that Buchler breached this agreement because, after he left CNIS, he sent a letter to the Delaware Transit Corporation which stated, in pertinent part:

> As stated at our meeting, I feel New Castle Insurance, Ltd is extremely
> capable of servicing your group's Life, vision, short-term disability and

5

long-term disability programs. <u>I being personally familiar with the unique plan design needs to the Delaware Transit plan will certainly be beneficial when marketing the plan in an effort to maintain the most competitive rates</u>.

(App. 793) (emphasis added).

Even if the information referred to in this letter was confidential information, something that Buchler disputes, CNIS cannot sustain a breach of contract claim based on its use because there is no evidence that CNIS sustained damages as a result of the letter or Buchler's contact with Delaware Transit. Delaware law "requires a showing of compensable injury" for a breach of a confidentiality agreement claim. <u>Kronenberg v. Katz</u>, 2004 WL 1152282 at *29 (Del. Ch. 2004) (citing <u>Great Lakes Chem. Corp. v. Pharmacia Corp.</u>, 788 A.2d 544, 549 (Del. Ch. 2001)). Here, it is undisputed that Delaware Transit did not follow Buchler to New Castle Insurance, but remained a CNIS customer. We affirm the District Court's grant of summary judgment on this claim.

C.

The District Court next concluded that there was no evidence to support the claims that Marianne Pistoria breached the non-solicitation and confidentiality provisions in her employment agreement. This Court will affirm.

It is undisputed that Pistoria's non-solicitation agreement applies to both involuntary and voluntary termination situations. (App. 402-04.) There is no evidence, though, that Pistoria breached the provision. Pistoria testified that she did nothing to contact any CNIS customer or to aid New Castle Insurance in soliciting clients, (App.

6

622-23), and Robert Hackett, Jr., senior vice-president of CNIS and manager for the Delaware Division, admitted that he knew of no "specific proof" that she had, (App. 469-71, 600-01). CNIS argues that it is still reasonable to infer that Pistoria solicited clients in violation of her agreement because she worked at New Castle Insurance with Buchler who admitted to soliciting clients. To survive summary judgment, though, a party must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine issue. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). With no record evidence indicating that Pistoria solicited clients, this Court will affirm the decision of the District Court as to the non-solicitation agreement claim.

CNIS also bases its confidentiality agreement claim against Pistoria on an inference, asserting that "[c]ertainly, a jury could reasonably infer that Pistoria used . . . confidential CNIS information in servicing the accounts which followed Buchler and her to New Castle." (Appellant Reply Br. at 10.) Again, CNIS has presented no record evidence to support their suspicion. Summary judgment, therefore, was appropriate, see Celotex, 477 U.S. at 325, and this Court will affirm.

D.

This Court will also affirm the District Court's finding that CNIS did not sustain a claim for tortious interference with existing business relations. Under Delaware law, if "there is no sustainable claim of breach, there can be no viable claim for tortious interference" with existing business relations because the cause of action requires proof

7

that the defendant intentionally took an action which caused the existing client to breach its existing contract with the plaintiff. See Aspen Advisors v. United Artists Theatre Co., 843 A.2d 697, 713 (Del. Ch. 2004) (citing Goldman v. Pogo.com Inc., 2002 WL 1358760, at \*8 (Del. Ch. June 14, 2002); Irwin & Leighton, Inc. v. W.M. Anderson Co., 532 A.2d 983, 992 (Del. Ch. 1987)). Here, it is undisputed that Buchler, Pistoria, and New Castle Insurance did not cause any CNIS client to breach its contract with CNIS because all CNIS accounts were at-will, meaning that they were free to leave at any time and select another insurance representative. (See App. 57-58.) Therefore, CNIS cannot state a claim for tortious interference with existing business relations, and we will affirm.

E.

We will also affirm the District Court's grant of summary judgment in favor of Buchler, Pistoria and New Castle Insurance on the tortious interference with prospective contractual relations claim. To establish such a claim under Delaware law, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional, wrongful interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages. Gill v. Del. Park, LLC, 294 F. Supp. 2d 638, 645 (D. Del. 2003) (citing Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc., 5 F. Supp. 2d 238, 243 (D. Del. 1998)) (emphasis added). Here, CNIS has presented evidence that Buchler, Pistoria, and New Castle Insurance knew, or should have known, that CNIS had

8

a valid expectancy in the continued business of its existing clients. CNIS, though, has not presented proof that Buchler, Pistoria, or New Castle Insurance wrongfully interfered with that expectancy.

A competitor does not "wrongfully interfere" with its competitor's at-will customers by simply competing for their business. Restatement (Second) Torts § 768 (cited in Lipson v. Anesthesia Servs., P.A., 790 A.2d 1261, 1287 & n.80 (Del. Super. 2001)). Instead, the competitor is only liable if the plaintiff shows that the competitor used "wrongful means" to compete. "Wrongful means" are tactics which are sufficiently "predatory" that they form an independent basis for liability on the part of the defendant. See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 388 (3d Cir. 2004) (interpreting Restatement (Second) Torts § 768(1) and Pa. law). Such "independently actionable conduct" includes a defendant's breach of fiduciary duty, "physical violence, fraud, civil suits [or] criminal prosecutions." CGB, 357 F.3d at 389 (quoting Restatement (Second) Torts § 768, cmt. e). Provided the conduct is "sufficiently wrongful to be actionable by someone," it provides the basis for a tortious interference claim even if the party claiming tortious interference lacks standing to assert the claim. CGB, 357 F.3d at 389.

Here, CNIS asserts that Buchler, Pistoria, and New Castle Insurance used wrongful means because they solicited clients in violation of the Buchler and Pistoria nonsolicitation and confidentiality provisions. The claim fails insofar as Buchler and

9

Pistoria are concerned because there is no evidence that they breached the provisions, as explained supra, sections A-C. The claim against New Castle Insurance is based on its advertisement of Buchler's and Pistoria's arrival at the firm. While such action, if taken by Pistoria may have violated her nonsolicitation agreement, CNIS has not pointed to any "independently actionable" basis for liability against New Castle for the action. It has not shown that New Castle was bound by the contractual provision that it did not sign, that New Castle acted at Pistoria's direction or aided and abetted Pistoria in taking an action she was not otherwise permitted to take, or that New Castle had a fiduciary duty that extended to CNIS. New Castle, without help from Pistoria, merely reported Pistoria's arrival at the firm. Without further proof, summary judgment in favor of New Castle Insurance was appropriate on this claim as there is no evidence from which a reasonable factfinder could conclude that New Castle Insurance intentionally used "wrongful means."

For these reasons, this Court will affirm the District Court's decision in its entirety.