

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-5-2004

# Fiscus v. Wal Mart Stores Inc

Precedential or Non-Precedential: Precedential

Docket No. 03-2513

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Fiscus v. Wal Mart Stores Inc" (2004). *2004 Decisions*. Paper 178.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/178

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-2513

———

CATHY A. FISCUS,

APPELLANT

v.

WAL-MART STORES, INC.
d/b/a SAM'S WHOLESALE CLUB
#6678

On Appeal from the United States
District Court
for the Western District of Pennsylvania
(Dist. Ct. No. 01-cv-00836)
District Judge: Honorable Gary L.
Lancaster

———

Argued January 23, 2004

Before: ALITO and CHERTOFF,
*Circuit Judges*, and
DEBEVOISE,* *Senior District Judge*.

———

*Honorable Dickinson R.
Debevoise, Senior United States District
Judge for the District of New Jersey,
sitting by designation.

(Filed: October 5, 2004)

SAMUEL J. CORDES (Argued)
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222

*Counsel for Appellant*

BRADLEY A. SCHUTJER (Argued)
2157 Market Street
Camp Hill, PA 17011

*Counsel for Appellee*

ERIC S. DREIBAND
General Counsel

CAROLYN L. WHEELER
Acting Associate General Counsel

LORRAINE C. DAVIS
Assistant General Counsel

DANIEL T. VAIL (Argued)
1801 L Street, N.W.
Washington, DC 20507

Counsel for Amicus Appellant
Equal Employment Opportunity
Commission

———

OPINION OF THE COURT

———

CHERTOFF, *Circuit Judge*.

Appellant Cathy A. Fiscus, who
was an employee at appellee Wal-Mart,
suffered from end-stage renal disease from

1

1998 until she received a kidney transplant in September 1999. End-stage renal disease means near-total kidney failure. From 1998 until September 1999, therefore, Fiscus was required to undergo time-consuming and uncomfortable dialysis treatments to cleanse and eliminate waste from her blood.

Fiscus sought a reasonable accommodation from her employer during the period of her dialysis. Wal-Mart declined. As a consequence, she was placed on leave, which expired before the recuperation period from her kidney transplant.

Fiscus sued under the Americans with Disabilities Act. Wal-Mart asserted that her kidney failure was not a covered disability, arguing that the inability to cleanse one's own blood and eliminate body waste does not amount to the limitation of a major life activity under the statute. The District Court agreed with Wal-Mart. We do not. Because we conclude that a physical impairment that limits an individual's ability to cleanse and eliminate body waste does impair a major life activity, we will reverse the judgment of the District Court in favor of Wal-Mart.

I.

From October 1986 through March 2000, Cathy A. Fiscus served as an employee of Wal-Mart Stores, Inc., working at the company's Sam's Warehouse Club Store in Pittsburgh, Pennsylvania. During her twelve-year tenure at the store, Fiscus was assigned to a number of different departments, including paper goods, housewares, hard lines, grocery, and bakery. Fiscus was responsible for lifting and stocking goods in the aisles. In the fall of 1997, Fiscus was placed in the bakery department and was eventually assigned to the night-shift bakery-wrapper position.

In November of 1995, Fiscus was diagnosed with renal (kidney) failure. Over the next few years, her condition deteriorated, and in July 1998, she was diagnosed as having end-stage renal disease, the condition of total or near-total permanent kidney failure. Fiscus had dialysis treatment from July 1998 through September 1999. For the first half of her treatment, from July 1998 through December 1998, Fiscus underwent hemodialysis, a process by which the blood is cleansed mechanically. Fiscus spent four to six hours, three times a week, hooked to a machine to have her blood cleansed. Throughout the course of her hemodialysis treatment, she continued to work in her overnight position at Sam's Warehouse Club.

Because of complications associated with hemodialysis, Fiscus changed her treatment to peritoneal dialysis in mid-December 1998. This regimen required Fiscus to administer the forty-five minute dialysis process to herself every four to six hours each day. At the start of her treatment, Fiscus was allowed to perform the dialysis at her work premises.

2

Around the time she started peritoneal dialysis, Fiscus suffered a fall at work and was absent from work for a short period of time. In January 1999, Fiscus returned to work and was removed from her position as a baker/wrapper after she indicated in a company form that she was not able to perform functions without reasonable accommodation.[1] When the store manager proposed that Fiscus take a day shift position, such as a "Greeter," Fiscus requested that she be able to perform dialysis on Wal-Mart's premises. This request for accommodation was denied, and Fiscus was informed that there were no available positions for her. Instead, the store manager advised her to take disability leave, which she did.

In September of 1999, Fiscus underwent a kidney transplant and was unable to work for five and a half months, until March 30, 2000. On March 15, 2000, Wal-Mart fired Fiscus because she had been unable to return to work within a year.[2]

Fiscus filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging disability

discrimination and later filed suit in District Court. Fiscus alleged in her complaint that she suffered from renal disease and that "renal disease is a disability within the ADA as it is [a] physical impairment that substantially limits major life activities." App. at 10. Fiscus also claimed that Wal-Mart removed her from her baker/wrapper position because of disability, failed to accommodate her disability, and terminated her because of her disability. App. at 11.

Wal-Mart filed a motion for summary judgment, arguing that Fiscus was not "significantly limited in a major life activity." Fiscus countered by asserting that she was substantially limited in the major life activity of "processing body waste and cleaning her blood" and that "complete failure of [her] kidneys substantially limits her ability to perform the major life activities of eliminating body waste; of cleaning her blood; and of caring for herself."

In his Report and Recommendation, the Magistrate Judge recommended that Wal-Mart's motion for summary judgment be granted. She concluded that "[t]he activities of processing bodily waste and cleansing blood do not comport with the definition of 'major life activity' under the ADA" and that these activities were "kidney function[s]," which were not a major life activity under the ADA. The Magistrate Judge also concluded that Fiscus had not identified other "major life activities" that

---

[1] Fiscus claims that the manager removed her as a baker/wrapper after she had informed him that she would need assistance with tasks that involved heavier lifting.

[2] Wal-Mart had a policy of allowing employees to take only up to one year of medical leave.

3

were substantially limited by her renal disease.

The District Court adopted the Magistrate Judge's Report and Recommendation in its entirety and granted summary judgment for Wal-Mart. We exercise plenary review over a grant of summary judgment. Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 87-88 (3d Cir. 2000).

II.

The ADA mandates that covered businesses provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A). A qualified individual with a disability under the statute is someone with a disability who "with or without reasonable accommodation" can perform the essential functions of a particular job. 42 U.S.C. § 12111(8). Disability, in turn, is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of the individual." U.S.C. § 12102(2). Thus, to establish a statutorily protected disability, the employee must show that she has an impairment; identify the life activity that she claims is limited by the impairment; and prove that the limitation is substantial. Bragdon v. Abbott, 524 U.S. 624, 631 (1998).

In this case, there is no dispute that end-stage renal disease, with which Fiscus

was afflicted during 1998 and 1999 (until her transplant), is a physical impairment. The kidneys are vital organs that clean the blood and help eliminate bodily waste. Kidney failure is incurable; it requires either regular dialysis—mechanical blood cleansing—or a transplant. But Wal-Mart argues, and the District Court agreed, that cleansing the blood and processing bodily waste do not constitute a "major life activity" within the meaning of the ADA. The District Court stated that Fiscus's allegation that she could not cleanse her blood and process waste without mechanical assistance was simply another way of stating that she was "substantially limited in the major life activity of kidney function." Magistrate Op. 10. The Court reasoned that impairment of an organ does not in itself constitute a limitation on a life activity. So, the District Court concluded, to succeed, Fiscus would have to show that the inability to cleanse blood limited her in doing something else that would be described as a life activity.

The District Court erred in its point of departure. Fiscus does not allege that her disease limited her in the life activity of "kidney function." She contends that she was limited in the major life activities of cleansing her blood and processing waste. Appellant Br. at 15. By re-characterizing Fiscus's claim as an allegation "that she is substantially limited in the major life activity of kidney function," the District Court simply assumed away her argument. Fiscus's position is clear: Absence of kidney function was the impairment; the

consequence was the impact on the activity of blood cleansing and body waste processing. Thus, it was incorrect for the District Court to conflate the two, and to interpret Fiscus's contention as nothing more than claiming a limitation on the life activity of kidney functions.

That leads to the question—are cleansing and eliminating waste from the blood a major life activity? To be sure, these are normally internal body functions which are not volitional—i.e., which occur automatically. But that does not mean that they may not be considered a major life activity. Even internalized and autonomous body activities may qualify as major life activities within the meaning of the ADA.

The ADA itself does not comprehensively define the meaning of "major life activity," but it does specifically direct that the statute be construed so that it meets the standards set forth in the Rehabilitation Act of 1973, 29 U.S.C. § 790 et seq., and the regulations issued thereunder. 42 U.S.C. § 12201(a). Regulations under the Rehabilitation Act furnish a representative—but not exhaustive—list of functions that should be deemed major life activities. These include, "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii); 28 C.F.R. § 41.31(b)(2)(1997).

These major life activities are conceptually distinct from the physical impairments that gives rise to them. But they also do not necessarily involve externally visible or volitional behavior. Breathing, for example, is largely involuntary. Thinking—which this Court has held constitutes a major life activity, Gagliardo v. Connaught Lab., Inc., 311 F.3d 565, 569 (3d Cir. 2002); Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999)—is largely internal and invisible, although the effects of thought (or its absence) are externally manifested. Indeed, "thinking" well illustrates that the distinction between the physical impairment and the affected life activity is often fine, indeed. For example, a chemical imbalance in the brain can affect thinking. One may view that impairment as characteristic of brain damage but also as a limitation on mental ability and thought. How one characterizes the difference depends on whether one looks to the chemistry of the brain or to the thinking activity of the mind.

Furthermore, in Bragdon v. Abbott, the Supreme Court expressly rejected the claim that a major life activity is limited to "those aspects of a person's life which have a public, economic, or daily character." 524 U.S. at 638. Relying on the "breadth of the term" major life activity, id., the Court held that HIV infection (as a physical impairment) substantially limited the major life activity of "reproduction," not because it physically prevented pregnancy, but because the infection deterred the plaintiff from seeking to become pregnant.

5

The decision in Bragdon teaches several useful lessons in construing the ADA. First, it undercuts any dispositive conceptual difference for ADA purposes between internal, largely autonomous physical activities on the one hand, and external, largely volitional physical activities on the other. In Bragdon, the Court found that reproduction satisfied the statutory definition of major life activity because "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself." 524 U.S. at 638. Yet reproduction in itself, as the dissent pointed out, is not an external process. 524 U.S. at 658-59 & n.2. That is to say, after the (normally) volitional act of conception, reproduction for the woman largely takes place autonomously and internally until birth. And while pregnancy can be debilitating for some women, many others can pursue their daily routines with little limitation or handicap. An impairment of the ability or willingness to reproduce, moreover, would not necessarily impinge on the woman's ability to engage in nonreproductive (protected) sexual relations or the raising of an adopted child. Despite these facts, the Bragdon majority treated reproduction by itself as a major life activity, without the need to demonstrate any impact that pregnancy might have on some other volitional or external activity, such as working, walking, etc., and without regard to the plaintiff's continued ability to engage in at least some sexual behavior and raise children. Compare 524 U.S. at 660-61 (Rehnquist, C.J., dissenting).

Second, the Court in Bragdon required no showing that reproduction or the decision to reproduce was a recurrent or daily feature of life for someone in plaintiff's position. The dissent correctly observed that unlike the regulatory examples of major life activities such as breathing, walking and seeing, reproduction is not (usually) "repetitively performed and essential in the day-to-day existence of a normally functioning individual." 524 U.S. at 660. But the majority opinion rejected any such test. The Court found it sufficient that reproduction—although generally not routine—was comparable in importance to life activities such as working and learning. The touchstone is not publicity or frequency, but importance to the life of the individual.

Third, the Bragdon Court found that insofar as the risk of perinatal transmission of HIV deterred the plaintiff from voluntarily seeking to become pregnant, HIV constituted a substantial limitation on plaintiff's life activity of reproduction. Importantly, the HIV infection did not make it physically impossible for the plaintiff to conceive, gestate, and give birth. And, the Court also assumed that the risk of transmission during pregnancy was considerably less than fifty-fifty, perhaps as low as eight percent. Nevertheless, the Court concluded that an HIV-positive woman's decision to avoid even that risk meant that HIV imposed a substantial limitation on reproduction. The Court thus held that a limitation need not rise to the level of

6

"utter inabilit[y]." 524 U.S. at 641. It need not even be based entirely on physical constraints; in Bragdon, the Court based its finding of substantial limitation in part on the legal and economic consequences that forseeably ensue if an HIV-infected mother becomes pregnant. What matters is a broad practical assessment of whether an individual's ability to pursue the major life activity is limited by the physical impairment or condition from which he or she suffers.

We distill from Bragdon, therefore, the following: A major life activity need not constitute volitional or public behavior; it need not be an activity that is performed regularly or frequently; but it does have to have importance to human life comparable to that of activities listed in the regulatory examples. We also read the Supreme Court to hold that a substantial limitation of a major life activity does not mean impossibility or even great physical difficulty; rather, substantial limitation is weighed in a broad, practical sense, and may include non-physical factors.

With these teachings in mind, we disagree with the District Court's conclusion that impaired elimination of waste and blood cleansing are nothing more than characteristics of kidney failure. Rather, they are the *effect* of kidney failure in the same way that impaired thinking is the *effect* of organic brain disease. And the fact that the effect of kidney failure is felt on an internal autonomous organic activity is, under Bragdon, not incompatible with a finding of substantial limitation of a major life activity.

Under Bragdon, the touchstone of a major life activity is its importance or significance. An activity which is "central to the life process," 524 U.S. at 638, expressly meets that test. By that standard, processing and eliminating waste from the blood qualifies as a major life activity because, in their absence, death results. In this respect, waste elimination is comparable to other life-sustaining activities such as breathing, eating, or drinking, all of which have been held to be major life activities within the statute. See, e.g., 29 C.F.R. § 1630.2(i); Lawson v. CSX Transp., Inc., 245 F.3d 916, 923 (7th Cir. 2001) (eating); Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999) (eating, drinking, and learning). Our own court has held under Title II of the ADA that "digestion" is a major life activity. Doe v. County of Ctr., 242 F.3d 437, 447 (3d Cir. 2001). And the Sixth Circuit has expressly held that waste elimination—i.e., controlling one's bowels—can be a major life activity. Workman v. Frito-Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1999); see also Gilbert v. Frank, 949 F.2d 637, 641 (2d Cir. 1991) (assuming that kidney failure that limits removal of waste without dialysis substantially limits ability to care for one's self).

In reaching its conclusion that blood cleansing and waste elimination are not a major life activity, the District Court relied on two other decisions. One was Furnish v. SVI Systems, Inc., 270 F.3d

7

445 (7th Cir. 2001), in which the court held that cirrhosis of the liver did not constitute a substantial limitation on a major life activity. Furnish was adjudicated, however, on the express theory that the major life activity was nothing more or less than "liver function." The plaintiff did not assert that the impaired liver function actually affected waste removal or blood cleansing. Indeed, there was every indication that the plaintiff's liver functioned within the normal range. Id. at 450. Furnish might serve as a useful precedent if Fiscus were merely alleging damaged kidneys, but as we have seen, her claim goes further to cover an inability to process and eliminate waste in the blood.

The District Court also relied on Fraser v. United States Bancorp, 168 F. Supp. 2d 1188, 1194 (D. Or. 2001). That case declined to find that the effect of diabetes on food metabolization is, without more, a substantial limitation on a major life activity. That decision was substantially—if not entirely—undercut by its subsequent reversal on appeal. The Ninth Circuit disagreed with the District Court, and held that a diabetic plaintiff could claim a substantial limitation on the life activity of eating. Fraser v. Goodale, 342 F.3d 1032, 1039-40 (9th Cir. 2003). The eventual disposition of Fraser is consistent with our decision here.

We hold, therefore, that the District Court erred in deciding that elimination of waste from the blood is not a major life activity under the ADA.

III.

Fiscus also challenges the ruling of the District Court rejecting her claim that her renal disease substantially limited her ability to care for herself. The District Court did not contest that under the Rehabilitation Act regulations, caring for one's self is explicitly recognized as a major life activity. Instead, the District Court held that Fiscus had not adequately alleged in a pleading—i.e., her complaint—that caring for herself was a life activity that was substantially limited by her kidney disease. Magistrate Op. at 12.

We believe that the District Court read the complaint too narrowly in holding that Fiscus was not entitled to prove a substantial limitation on her ability to care for herself.

Fiscus's complaint alleges that she suffered from end-stage renal disease and that it substantially limits major life activities. App. at 10. This was sufficient to meet the notice pleading requirement with respect to Fiscus's disability under our decision in Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113 (3d Cir. 1998). Accordingly, Fiscus was entitled to establish that her end-stage renal disease substantially limited her ability to care for herself. We of course express no opinion on whether she will succeed in doing so.

Finally, Wal-Mart argues as an alternative ground for dismissal that even if cleansing blood was a major life

8

activity, Fiscus's dialysis treatments fully mitigated the impact of her kidney disease, so that there was no longer a substantial limitation in performing that activity.

Wal-Mart is correct that a court must assess the limitation on a major life activity in light of any corrective measures plaintiff uses to mitigate her impairment. Sutton v. United Airlines, Inc., 527 U.S. 471, 488 (1999); Taylor, 184 F.3d at 302. So, for example, in Sutton the Supreme Court held that a visually impaired plaintiff's limitations must be considered in light of his use of corrective eyeglasses. 527 U.S. at 488. By the same token, however, any evaluation of the mitigating effects of corrective measures must also consider side-effects or other collateral limitations caused by those corrective measures. Sutton, 527 U.S. at 484; Taylor, 184 F.3d at 308-09. In Fiscus's case, therefore, the limitations caused by her kidney failure must be weighed in light of her ability to conduct peritoneal dialysis but with due regard for any side-effects or residual effects.

Here, the record certainly supports the view that both hemodialysis and peritoneal dialysis were time-consuming and cumbersome processes, requiring specialized equipment and limiting Fiscus's mobility and other aspects of daily living. Because the District Court did not address these matters, however, we decline to do so in the first instance on appeal. On remand, the District Court should consider whether dialysis eliminated any substantial limitation on the major life activities of cleansing blood and caring for one's self, bearing in mind collateral and side-effects.

9