**Paul SNYDER, Plaintiff,**

v.

**NORFOLK SOUTHERN RAILWAY CORPORATION, Defendant.**

**Civil Action No. 05–01233.**

United States District Court,
E.D. Pennsylvania.

Nov. 15, 2006.

Gregory G. Paul, Peirce Raimond & Coulter, Pittsburgh, PA, for Plaintiff.

Jessamyne M. Simon, Klett Rooney Lieber & Schorling, Philadelphia, PA, for Defendant.

### MEMORANDUM AND ORDER

STENGEL, District Judge.

Paul Snyder ("Snyder"), the plaintiff, brought this action under the American with Disabilities Act ("ADA") against Norfolk Southern Railway Corporation ("NSR"). Snyder is a locomotive engineer with NSR. Snyder was medically disqualified from his position in September 2003 due to a history of heart disease and the evidence of heart ischemia. Heart ischemia is a restriction in the flow of blood to the heart. NSR reinstated Snyder to his engineer position with the company in July 2004, when his medical tests showed he did not suffer from ischemia. The Equal Employment Opportunity Commission issued Snyder a Right to Sue letter in December 2004 based on the disqualification. He filed suit in March 2005 alleging violations of his civil rights in contravention of the ADA. On April 10, 2006, NSR filed a motion for summary judgment. For the reasons set forth below, I will grant NSR's motion for summary judgment.

### I. BACKGROUND[1]

Paul Snyder began his employment with NSR on June 1, 1999, as a locomotive engineer. The engineer's primary job responsibility is to operate the controls of an engine and monitor its movement and move it safely from one point to another. In addition, during the course of performance of their duties, engineers must conduct inspections of the locomotive, hook up cables, operate hand brakes, remain alert to track signals, and listen to instructions from conductors and yardmasters. A collective bargaining agreement exists between NSR and the Brotherhood of Locomotive Engineers and Trainmen ("BLET") and it governs NSR's locomotive engineers' working conditions, rules, and pay. It also provides a procedure for an engineer to follow to challenge a decision to medically disqualify him.

In November 1999, Snyder had a heart attack and underwent an angioplasty procedure to put a stent in one of his arteries. Two weeks later Snyder underwent another angioplasty procedure due to a blockage in the stented artery. Following his heart attack, Snyder was held out of service by NSR until December 2000. In December 2000, Snyder returned to work without restriction as an engineer. Snyder admits that NSR's decision to hold him out of service during this time was not discriminatory in any way.

On July 15, 2003, Snyder underwent a physical examination as part of the recertification process for engineers. As part of the examination, Snyder completed a form detailing his medical history. Snyder indicated his heart disease on the form, including the stent and his high blood pressure, which he stated was controlled by medication. Based upon a physical exam, which did not include a stress test, and the information provided by Snyder, the medical examiner recommended Snyder "as qualified with no work restrictions/accommodations."

The results of Snyder's July 15, 2003 examination were forwarded to NSR's Medical Department. After reviewing the results, NSR sent a letter to Snyder dated July 24, 2003 requesting additional infor-

---

**1.** The facts of this case are derived from the admitted facts of the defendant's Statement of Undisputed Facts in Support of Defendant's Motion for Summary Judgment, the plaintiff's Counterstatement to Defendant's Statement of Undisputed Facts, and the deposition testimony submitted to the court.

mation pertaining to his coronary heart disease. In particular, the letter provided: "Please have your personal doctor provide ... current medical records regarding your heart condition to include the results of your most recent sub-maximal exercise stress test following your angioplasty procedure. The exercise test ... should be negative for any evidence of ischemia."

In response to the July 24, 2003 letter, Snyder arranged for his cardiologist to forward to NSR's Medical Department the results of his January 30, 2003 stress test and for his physician, Dr. Tatyana Erlikh, to forward the notes from Snyder's April 28, 2003 visit.[2] The cardiologist report indicated his stress test was "suggestive of some underlying ischemia." Dr. Erlikh's notes indicated the results of the stress test were positive, but Snyder's coronary artery disease was stable.

On September 11, 2003, Paula Jo Lina, M.D., associate medical director of NSR, sent Snyder a letter informing him that he was being disqualified from active service as an engineer. Snyder was not discharged; he was "suspen[ed] from active service for medical reasons." Dr. Lina stated his medical condition, coronary artery disease, was inconsistent with NSR's medical guidelines because it did not permit safe performance of the essential functions of his position. The letter advised Snyder of his rights under the collective bargaining agreements, including the right to consult his own doctor to determine if he meets the medical guidelines of an engineer. In addition, Dr. Lina informed Snyder that she would re-evaluate his disqualification if a doctor finds an improvement in his heart condition to the extent it meets NSR's medical guidelines. Finally, the letter informed Snyder of the opportunity to seek employment in any vacant position for which he qualifies.

NSR's Fee–For–Service Manual explains the medical guidelines that govern the decisions of the NSR Medical Department. In the relevant portion of the manual, entitled Coronary Artery Disease in Applicants/Employees with Safety–Sensitive and/or Non–Sedentary Positions, the manual provides: "Applicants/employees in safety-sensitive ... positions who have known artery disease, or who are status post a myocardial infraction or cardiac procedure such as coronary artery by-pass or angioplasty will be given individual consideration for fitness for service. As a general rule, these individuals should have their doctor furnish the results of a sub-maximal exercise stress test ... negative for ischemia, prior to a qualification recommendation."[3] If an engineer with ischemia is medically disqualified, he *must* present evidence that he tested negative for ischemia to return to his position of engineer. *See* Dr. C. Ray Prible, NSR's Medical Director, Dep. at 26–27.

In response to the September 11, 2003 letter, Snyder sent a letter to NSR from the Cardiology Associates of West Reading. The letter was signed by Dr. Peter M. Will above Dr. Michael Koslow's name and indicated he had conducted a detailed

---

**2.** Dr. Erlikh's notes from Snyder's August 19, 2003 office visit were also eventually forwarded to NSR.

**3.** The introductory paragraph of this section of the manual states: "The medical criteria for qualification correlate with essential job functions, work environment, regulatory and safety requirements and business necessity. The medical guidelines which follow are to be considered guidelines, and should not be construed to override or take the place of sound clinical judgment.... Qualification recommendations must be based on an individualized assessment of each case, including both the individual's personal medical condition and the essential job functions of the specific position involved."

review of Snyder's cardiac history.[4] The letter stated in pertinent part: "[C]linically you have done quite well in recent years and on routine follow-up visits have not complained of any recurrent chest pain. Your nuclear stress test from the 30th of January was somewhat abnormal, but is consistent with your known coronary anatomy and your history of previous infarctions of the inferolateral wall. Based upon your lack of clinical symptoms and the results of the stress test, I do not see a reason at this time why you can't continue in your present position with the railroad."

Dr. Lina reviewed the September 12, 2003 letter from Cardiology Associates of West Reading. Dr. Will's diagnosis of Snyder, however, did not alter Dr. Lina's conclusion. In a letter dated September 17, 2003, Dr. Lina wrote: "After reviewing the results of the medical report provided by Dr. M. Koslow dated 9/12/03 and your stress test report dated 1/30/03 demonstrating evidence of ischemia, the essential functions of your job and available accommodations, I must disqualify your from active service in the position of Engineer." The letter also included the same language as contained in Dr. Lina's September 11, 2003 letter regarding Snyder's rights under the collective bargaining agreement and the ability for re-evaluation if his condition improves. Snyder did not take advantage of the provisions of the collective bargaining agreement nor did he seek employment in another position at NSR.

Ischemia is a condition in which the blood flow (and thus oxygen) is restricted to a part of the body. Cardiac ischemia, therefore, is lack of blood flow and oxygen to the heart muscle. Ischemia can result from coronary artery disease. Coronary artery disease is the hardening of the arteries of the heart, which decreases blood flow. In addition, ischemia can develop as a result of a person having had a heart attack. The area of the heart where the heart attack occurs includes dead tissue (also known as infarct). The dead tissue may not receive adequate blood supply and that area would be described as an ischemic area. *See* Dr. Lina Dep. at 14–17; Dr. Prible Dep. at 11–15; Dr. DePace Expert Report, Ex. 2 to Pl. Resp. Mot. Summ. J.

On or about October 6, 2003, Snyder called Dr. Lina to discuss NSR's medical guidelines. Dr. Lina explained to Snyder that his stress test results, which demonstrated evidence of ischemia, were not consistent with NSR's medical guidelines. She stated that due to Snyder's cardiac condition he would need to demonstrate no evidence of ischemia to be medically qualified as an engineer. Dr. Lina reiterated to Snyder that his doctor could provide updated results or new information about his condition.

On June 4, 2004, Snyder's attorney submitted to NSR the results of a stress test conducted on Snyder on May 24, 2004 and a letter from Snyder's treating cardiologist. The test was negative for ischemia and the cardiologist concluded that the stress test "demonstrates normal blood flow to your heart at this time." As a result of this updated diagnosis, NSR scheduled Snyder for a return to work physical and approved his return to work without restriction. Snyder returned to active service as an engineer on July 1, 2004 in the same assignment he held prior to the medical disqualification.

As a result of his medical disqualification, Snyder filed charges with the Equal Employment Opportunity Commission ("EEOC") claiming violations of his rights under the ADA. The EEOC issued a dis-

---

**4.** Dr. Will only reviewed Snyder's existing medical records in preparation to write the letter. He did not perform any additional medical tests on Snyder.

missal and right to sue letter on December 15, 2004. On March 16, 2005, Snyder filed a complaint in this court alleging violations of the ADA. On April 10, 2006, NSR filed a motion for summary judgment, to which Snyder filed a response. On May 9, 2006, NSR filed a reply brief in support of its motion for summary judgment in order to respond to arguments Snyder raised for the first time in his response brief. This court held oral arguments on the motion for summary judgment on September 14, 2006.

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56©. An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

In this case, the defendant bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While plaintiff bears the burden of proof on a particular issue at trial, defendant's initial *Celotex* burden can be met simply by pointing out to the court that there is an absence of evidence to support plaintiff's case. *Id.* at 325, 106 S.Ct. 2548. After the defendant has met its initial burden, plaintiff's response, by

affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. *Fed.R.Civ.P.* 56(e). That is, summary judgment is appropriate if plaintiff fails to rebut defendant's assertions by making a factual showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the plaintiff. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505. If plaintiff has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit defendant's version of events against the plaintiff, even if the quantity of defendant's evidence far outweighs that of the plaintiff's. *Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

## III. Discussion

### A. Analytical Framework and a Prima Facie Case

■ The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such

impairment; or © being regarded as having such an impairment." 42 U.S.C. § 12102(2). It is important to note that "whether a person has a disability under the ADA is an individualized inquiry." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

The plaintiff presents his ADA disability discrimination case under a disparate treatment theory. He outlines his case using the *McDonnell Douiglas* burden-shifting framework and claims that NSR's policy of disqualifying engineers who have ischemia is per se disability discrimination. NSR's motion of summary judgment is predicated on Snyder not being able to establish a *prima facie* case of disability discrimination and the business necessity defense.

The disparate treatment theory can be divided into two categories—pretextual discrimination and facial discrimination. *See Healey v. Southwood Psychiatric Hospital,* 78 F.3d 128, 131 (3d Cir.1996). A pretext claim is analyzed under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In other words, if the discrimination claim is based on circumstantial evidence, the court will apply the burden-shifting framework of *McDonnell Douglas.* The *McDonnell Douglas* analysis, however, is inapt when the case involves direct evidence of discrimination. *See Keys v. City of Philadelphia,* No. 04–0766, 2005 WL 3234847, *3, 2005 U.S. Dist. LEXIS 30137, at *9 (E.D.Pa. Nov. 29, 2005).

Here, there is no dispute that NSR medically disqualified Snyder because of his heart condition. Snyder claims his heart condition resulted in him being disabled for ADA purposes. Thus, NSR's actions do not serve as a pretext to discrimination, but rather as direct evidence of alleged disability discrimination. Accordingly,

without using the *McDonnell Douglas* framework, Snyder can survive NSR's motion for summary judgment by setting forth sufficient evidence that a reasonable juror could find establishes a prima facie case of discrimination. *See Keys,* 2005 WL 3234847, *3, 2005 U.S. Dist. LEXIS 30137, at *9–10.

■ To establish a prima facie case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir.1999) (citations and quotations omitted). Snyder fails to satisfy his obligation.

*B. Disability*

Under the ADA, a disability is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or © being regarded as having such an impairment." 42 U.S.C. § 12102(2); *see Tice v. Centre Area Transportation Authority,* 247 F.3d 506, 512 (3d Cir.2001). In his response brief, Snyder argues he was actually disabled under the first definition of disabled and he was "regarded as" disabled under the third definition. In oral arguments on NSR's motion for summary judgment, however, Snyder's counsel informed the court that his client was only seeking the ADA's protection under the "regarded as" definition of disability. Therefore, the court's analysis will be limited to that definition.

■ "For an individual to be 'disabled' under the 'regarded as' portion of the

ADA's definition of disability, the individual must demonstrate ... the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities." *Tice,* 247 F.3d at 514.[5] "[A]n inquiry into how an employee was 'regarded' is necessarily quite fact-specific, and all of the surrounding circumstances may be relevant in reaching a conclusion." *Id.* at 515. "The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel University,* 94 F.3d 102, 109 (3d Cir.1996). "In establishing that an employer regarded an employee as having a disability, the employee must demonstrate that the employer regarded the employee as having a disability that if real would substantially limit a major life activity." *Benko v. Portage Area School District,* No. 03–233J, 2006 WL 1698317, *10, 2006 U.S. Dist. LEXIS 40573, at *32 (E.D.Pa. June 19, 2006). "[I]t is the employer's perception which matters, and not the employee's actual limitations...." *Vierra v. Wayne Memorial Hospital,* 168 Fed.Appx. 492, 496 n. 3 (3d Cir.2006).

Therefore, for Snyder to establish a statutorily protected disability, he must: (1) show he had an impairment at the time of the medical discharge; (2) identify the major life activity the impairment allegedly affected; and (3) prove that NSR believed that the impairment substantially limited the major life activity. *See Fiscus v. Wal–Mart Stores, Inc.,* 385 F.3d 378, 382 (3d Cir.2004). No one disputes that Snyder's heart condition qualified as an impairment.[6]

### 1. Major Life Activity

■ In its motion for summary judgment and supporting memorandum, NSR argues its position under the assumption that Snyder's claim rested on the major life activity of "working." In his response memorandum, however, Snyder asserts that "the pumping and circulating of blood" and "living" are the major life activities at issue in this case. Snyder altered his stance at oral arguments and informed the court that he was only pursuing "the pumping and circulating of blood" argument.

NSR argues in its reply brief that the court should not allow Snyder to support his claims under a theory he never raised during discovery. While the defendant's objections are legitimate, any prejudice to NSR and any impairment to the summary judgment function due to the late assertion of this legal argument are minimal.[7] NSR

---

5. The Third Circuit has recognized two other ways a plaintiff can demonstrate he was "regarded as" disabled: (1) "despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that substantially limits major life activities," *Tice,* 247 F.3d at 514, or (2) the plaintiff " 'has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairments.' " *Id.* at 514 n. 6 (quoting 29 C.F.R. § 1630.2(1)(2)). Snyder does not claim to be disabled under either of these two definitions.

6. The ADA itself does not define the term impairment, but the Code of Federal Regulations describes a "physical or mental impairment" as "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, ... cardiovascular...." 29 C.F.R. § 1630.2(h).

7. NSR relies on *Martin v. Merrell Dow Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3d Cir. 1988), to support its argument; however, that case is not on point. *Martin* dealt with a situation in which a party was examined at length in a deposition and later submitted an

filed a reply brief to respond to Snyder's legal arguments and had an opportunity to further present its case at oral arguments. In addition, discovery focused on Snyder's heart condition, NSR's medical guidelines, and how NSR's Medical Department viewed Snyder's condition. The factual record as to how NSR regarded Snyder's heart function at the time of the medical disqualification was fully developed. Therefore, this court must determine if the pumping and circulating of blood is a major life activity under the ADA.

Snyder argues the pumping and circulating of blood is a major life activity under the EEOC interpretive guidelines and the Third Circuit case *Fiscus v. Wal-Mart Stores, Inc.*, 385 F.3d 378 (3d Cir.2004). NSR does not raise any objection to Snyder's contentions.

The ADA does not define the term "major life activities," but the statute directs that it not be "construed to apply a lesser standard than the standard applied under . . . the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201. Examples of "major life activities" are found in the Rehabilitation Act regulations.[8] The non-exhaustive list of such functions include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii). Case law has used this list as a starting point when considering whether to characterize a function as a major life activity.

In *Fiscus v. Wal-Mart Stores, Inc.*, the Third Circuit held that the processing and eliminating of waste from the blood qualifies as a major life activity. In that case, the plaintiff suffered from kidney failure and argued that she was protected under the ADA because the cleansing of blood and the processing of bodily waste was a major life activity. In its analysis, the Third Circuit examined other functions that have qualified as major life activities and the Supreme Court decision in *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding reproduction satisfied the definition of major life activity because it is "central to the life process itself"). In finding for the plaintiff, the court stated:

> Under *Bragdon,* the touchstone of a major life activity is its importance or significance. An activity which is central to the life process expressly meets that test. By that standard, processing and eliminating waste from the blood qualifies as a major life activity because, in their absence, death results. In this

---

affidavit contradicting her factual statements at the deposition in order to create a genuine issue of fact. As a result, the court did not consider the affidavit when ruling on the motion for summary judgment. Here, Snyder denied that he was limited in any major life activity at his deposition; however, that is not fatal because Snyder should not be credited with knowing what is meant by the legal term of art "major life activity." In addition, his statement at his deposition does not contradict his position in his response. Snyder is proceeding under a "regarded as" disabled theory, which means it is not his actual limitation that is at issue but NSR's perception of any limitation.

8. The EEOC has issued its own regulations explaining the term "major life activities." *See* 29 C.F.R. § 1630.2(i); *Tice,* 247 F.3d at 512. The definition of the phrase in the EEOC regulation mirrors the definition in the Rehabilitation Act regulation. The Supreme Court, however, has not determined the level of deference to be afforded the EEOC guidelines. *Id.* at 512 n. 3. At the same time, the Court has interpreted and applied the EEOC regulations in its own jurisprudence. *See, e.g., Toyota Motor Mfg., Ky. v. Williams,* 534 U.S. 184, 193–96, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

respect, waste elimination is comparable to other life-sustaining activities such as breathing, eating, or drinking, all of which have been held to be major life activities within the statute.

*Fiscus,* 385 F.3d at 384 (internal quotations and citations omitted). *See also Gagliardo v. Connaught Labs.,* 311 F.3d 565, 569 (3d Cir.2002) (general cognitive functions, such as concentrating and remembering, are major life activities); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 307 (3d Cir.1999) (thinking is a major life activity); *Doe v. County of Centre, PA,* 242 F.3d 437, 447 (3d Cir.2001) (digestion is a major life activity under Title II of the ADA).

In its *Fiscus* holding, the Third Circuit explained the distinction between an impairment and the consequence or effect of the impairment, which often implicates a major life activity. "[M]ajor life activities are conceptually distinct from the physical impairments that gives [sic] rise to them. But they also do not necessarily involve externally visible or volitional behavior." *Fiscus,* 385 F.3d at 383. "[Impaired elimination of waste and blood cleansing] are the *effect* of kidney failure in the same way that impaired thinking is the *effect* of organic brain disease. And the fact that the effect of kidney failure is felt on an internal autonomous organic activity is, under *Bragdon,* not incompatible with a finding of substantial limitation of a major life activity." *Id.* at 384.

Keeping in mind that this "Circuit is generally unwilling to take a narrow view of what constitutes a major life activity," *Kurten v. Hanger Prosthetic,* 402 F.Supp.2d 572, 584–85 (W.D.Pa.2005), this court finds that the pumping and circulating of blood is a major life activity. As *Fiscus* made clear, "even internalized and autonomous body activities may qualify as major life activities within the meaning of

the ADA." *Fiscus,* 385 F.3d at 382. And the importance of the pumping and circulating of blood cannot be disputed. Since mostly all other major life activities rely on adequate blood flow for their performance, the pumping and circulating of blood is "central to the life process." If the heart was to cease performing this function, death would result. The pumping and circulating of blood is as much, if not more, a life sustaining activity as the elimination of waste.

In addition, an easy analogy can be drawn to the *Fiscus* holding to justify this holding. In *Fiscus,* the court recognized that the kidney organ served a certain purpose in the human body—the elimination of waste. The process used to accomplish that role was deemed a major life activity. In the same way, the heart organ's physiological purpose is to pump blood throughout the body. The process used to successfully complete that function must be considered a major life activity.

Impaired blood circulation is the effect of heart disease and, if the circulation is restricted enough, a court can find the disease has substantially limited a major life activity. It is necessary to determine whether NSR believed Snyder's heart condition substantially limited his heart's pumping and circulating of blood.

### 2. *Substantially Limited in a Major Life Activity*

■ NSR emphasizes the significance of the word "substantially" in the substantially limited standard. According to it, the most the plaintiff can demonstrate is that NSR regarded Snyder's ability to pump and circulate blood as limited during the nine months he was held out of service. NSR points to Snyder's eventual reinstatement as proof of its perception. At oral arguments, NSR stated that if it considered Snyder substantially limited in the

pumping and circulating of blood, it would not have allowed Snyder to get a second medical opinion or considered an update of his condition.

Snyder asserts that NSR regarded him as substantially limited in the pumping and circulating of blood because NSR axiomatically disqualifies engineers from service if they test positive for ischemia. Snyder points to Dr. Prible's deposition testimony and NSR's Fee–For Service Manual to support his contention. In addition, Snyder states that he may have shown signs of ischemia, but he was asymptotic and did not pose any safety threat. As a result, NSR did not properly diagnosis him; they followed their blanket policy and did not make an individualized determination of his condition. Snyder cites to the Third Circuit case of *Taylor v. Pathmark,* 177 F.3d 180, 182 (3d Cir.1999) ("[T]o successfully claim that he was wrongly regarded as disabled ..., a plaintiff need not be the victim of negligence or malice; an employer's innocent mistake (which may be a function of 'goofs' or miscommunications) is sufficient to subject it to liability under the ADA.").

■ Under the EEOC regulations,[9] "substantially limits" means:

(I) unable to perform a major life activity that the average person in the general population can perform; or

(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The factors a court should consider to determine if a person is substantially limited in a major life activity include: (1) the nature and severity of the impairment; (2) the duration or expected duration; and (3) the expected or actual permanent or long-term impact of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2). *See also Toyota Motor Mfg., Ky. v. Williams,* 534 U.S. 184, 195–96, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). It is important to note that the definition of "substantially limited" applies in the same way in "regarded as" disability cases as it does in "actual" disability cases. *See Tice,* 247 F.3d at 514.

In *Toyota Motor,* the Supreme Court highlighted the importance of the word "substantially" in the ADA's definition of disability. In *Toyota Motor,* the Supreme Court was faced with the question of what type of impairments substantially limit an individual in the major life activity of performing manual tasks. The Court held that "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor,* 534 U.S. at 198, 122 S.Ct. 681. The Court examined the legislative history of the ADA to arrive at its conclusion:

Substantially in the phrase 'substantially limits' suggests 'considerable or 'to a large degree.' ... That [the] terms ['major' and 'substantially'] need to be interpreted strictly to create a demanding standard for qualifying as disabled is confirmed by the first section of the ADA, which lays out the legislative find-

---

**9.** *See Emory v. AstraZeneca Pharms. LP,* 401 F.3d 174, 180 n. 4 (3d Cir.2005) ("We have, in the past, noted that because the ADA does not define many of the pertinent terms, we are guided by the Regulations issued by the Equal Employment Opportunity Commission to implement Title I of the Act." (internal quotations omitted)).

ings and purposes that motivate the Act. When it enacted the ADA in 1990, Congress found that 'some 43,000,000 Americans have one or more physical or mental disabilities.' If Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher.

*Id.* at 197 (internal citations omitted).

In the same manner, the Third Circuit in *Taylor v. Pathmark Stores, Inc.* noted:

The impairment must be severe when compared to the functioning of the general population. The purpose of the ADA would be undermined if protection could be claimed by those whose relative severity of impairment was widely shared. On the other hand, Congress expressed a strong remedial intent in enacting the ADA, and explicitly found that approximately forty-three million Americans were disabled as of 1990, which implies that the definition should not be so restricted that only the most extremely impaired are covered.

*Pathmark Stores,* 177 F.3d at 185–86 (internal citations omitted).

Dr. Prible, NSR's Medical Director, testified in his deposition that coronary heart disease is one of the two leading causes of death in the United States. Dr. Prible Dep. at 13. In fact, according to the American Heart Association, based on esti-mates from the year 2003, coronary heart disease is the single leading cause of death in America today. *See* http://www.americanheart.org/presenter.jhtml?identifier=4478. In 2003, 71,300,000 Americans had one or more forms of cardiovascular disease, with 65,000,000 individuals having high blood pressure and 13,200,000 having coronary heart disease. *Id.* In addition, Dr. Prible expressed the view that as a person gets older there is a great likelihood of having some coronary heart disease—"people who get over the age of 30 it becomes more and more prevalent among the population, to the point that most people probably over the age of 50 or 60 probably have an element of coronary heart disease." Dr. Prible Dep. at 13–14.

The court only brings this information to light to help it in its determination of what "substantially limited" means when the major life activity is the pumping and circulating of blood. This function of the heart is impacted in many different ways on a daily basis, through such things as diet, exercise, genetics, smoking, stress, weight, and age. It differs from other major life activities in that almost everyone has some limit in their ability to pump and circulate blood. In considering Snyder's arguments, therefore, it is important to give due weight to the Supreme Court's direction to interpret "substantially" strictly and to be cognizant of Congress's findings when it enacted the ADA.[10] Snyder must show more than mere difficulty in

---

**10.** If Congress intended to include all forms of cardiovascular disease in its definition of disability, it would have found more than forty-three million Americans as disabled. *See Toyota Motor,* 534 U.S. at 197–98, 122 S.Ct. 681 (citing *Sutton,* 527 U.S. at 487, 119 S.Ct. 2139, for the "finding that because more than 100 million people need corrective lenses to see properly, 'had Congress intended to include all persons with corrected physical limitations among those covered by the Act', it undoubtedly would have cited a much higher number [than 43 million] disabled persons in the findings"). The court also acknowledges that as the baby boomer generation gets older the major life activity discussed in this case becomes more relevant. "The purpose of the ADA would be undermined if protection could be claimed by those whose relative severity of impairment was widely shared." *Pathmark Stores,* 177 F.3d at 185–86.

the pumping and circulating of blood, but he does not need to demonstrate a complete inability to perform the function, i.e., heart failure.

Here, since Snyder is proceeding under the "regarded as" definition of disability, what matters is how NSR viewed Snyder's heart condition. In other words, did NSR medically disqualify Snyder because it considered his heart disease to be so considerable that it restricted him in the major life activity of pumping and circulating blood. In order to make this determination, it is necessary to look at NSR's medical guidelines found in the Fee–For–Service manual and the member of NSR's medical department that applied the standards to Snyder, namely Dr. Lina.

First, in the Fee–For–Service manual, an entire section is devoted to cardiac conditions. Section 3.1.1 presents a general overview of what NSR physicians should consider when evaluating an individual with an existing heart condition. The section recommends reviewing documents from the patient's personal physician, considering the physical requirements of the individual's position with NSR, and using sound clinical judgment to determine the depth of evaluation. The section concludes by listing the following conditions as potentially disqualifying: coronary heart disease, valvular heart disease, cardiomyopathies, EKG abnormalities and arrhythmia, aortic or ventricular aneurysm, congestive heart failure, mydocarditis or pericarditis, implantable pacemaker or defibrillator, prosthetic cardiac valve, and cardiac transplantation.

Section 3.1.1.1 of the manual requires the assessment of the presence or absence of coronary artery disease risk factors in any individual. For all NSR male pilots over the age of 39, a two step screening process exists to determine their fitness for service. If a pilot has an abnormal exercise stress test, he must be removed from flight duties pending further evaluation by their personal physician.

Finally, in section 3.1.1.2, the section applicable to Snyder and detailed above, coronary artery disease in an employee in a safety-sensitive position must be given individual consideration for fitness for service. But as a general rule, such an individual must have a stress test performed on him that indicates no ischemia, prior to qualification. However, "if an exercise stress test [is] reported as 'negative' at less than Bruce stage three completion, 8–10 METS, or 85% maximum predicted heart rate ... [it] should be referred to the Norfolk Southern Medical Director for further evaluation." The section continues by listing additional heart conditions that must be considered before reinstatement: angina, arrhythmia, and blood pressure.

Taken as a whole, and viewing the manual in the light most favorable to Snyder, NSR implemented a medical program intended to make an individualized assessment of each employee. In the area of the health of the heart, NSR is over-cautious with its criteria for safety-sensitive positions. A general rule of reinstatement that requires an individual to demonstrate no ischemia fails to account for the specific symptoms of the employee. The guidelines, however, do not indicate how NSR viewed an ischemic individual's heart function, i.e., how substantially limited it considered an ischemic heart in the pumping and circulating of blood. Therefore, it is necessary to examine how the guidelines were implemented with respect to Snyder.

Dr. Lina decided to medically disqualify Snyder so her perception of his ischemia is most pertinent.[11] In her deposition, she

11. Dr. Prible, the Medical Director at NSR,     indicated in his deposition testimony that the

stated: "If an engineer has ischemia, the ischemic part of the heart is an irritable focus of muscle that is susceptible to abnormal heart rhythms, arrhythmias. Abnormal heart rhythms or arrhythmias can be serious and can lead to sudden incapacitation, collapse, and in some cases sudden death." Dr. Lina Dep. at 22–23. She continued to testify that a person with ischemia has a significantly greater chance than other members of the general public to develop a heart arrhythmia. *Id.* at 23. Dr. Lina views an individual in a safety-sensitive position, with an increased chance of incapacitation or collapse, as a serious risk to the public's safety.

At the same time, the information utilized by Dr. Lina in deciding to disqualify Snyder did not prove the certain existence of ischemia.[12] Dr. Lina based her decision to medically disqualify Snyder on Snyder's full medical records that included the stress test report of January 30, 2003, notes from Snyder's April and August 2003 doctor visits, and the medical report dated September 12, 2003 from his cardiologist. *Id.* at 67, 70. The January 30, 2003 report notes the submaximum stress test is only *"suggestive of some residual ischemia"* and that Snyder exhibited no symptoms. The doctor's notes of April 2003 indicate Snyder's blood pressure and coronary heart disease are stable. The doctor's notes of August 2003 show Snyder's heart as "regular." The cardiologist informed Dr. Lina in his September 12, 2003 letter that the stress test results were somewhat abnormal, but were consistent with Snyder's history and coronary anatomy.

In addition, Dr. Lina testified at her deposition that she did not necessarily view ischemia as a permanent condition. "[I]t's unpredictable and it varies between individuals. . . . But as far as the duration of ischemia, once it's been identified, it's going to be variable between individuals, and it is somewhat unpredictable." *Id.* at 75. According to Dr. Lina, the blood flow to an area of a heart can be improved through medication, the passage of time, or other treatments, and thereby one can eliminate any evidence of ischemia. *Id.* at 76. Alternatively, ischemia can worsen based upon the lifestyle choices of the individual and his risk factor control. *Id.*

Finally, the letters written by Dr. Lina to Snyder provide a more complete picture of how she and NSR viewed Snyder's heart condition. In the letters dated September 11, 2003 and September 17, 2003, Dr. Lina explained that the medical disqualification was due to Snyder's coronary artery disease and the stress test results

---

determination of whether to medically disqualify someone is "in the purview of Dr. Lina's job responsibilities." Dr. Prible Dep. at 7.

12. Snyder tries to argue that NSR did not make individualized assessments of persons with ischemia before medically disqualifying them. Snyder does not put forth any evidence to rebut Dr. Lina's deposition testimony regarding the analysis she made of Snyder's complete medical record before disqualifying him. Therefore, this court will not give any consideration to these "bald assertions." The evidence in the record with regards to NSR's blanket policy of requiring the absence of ischemia comes from Dr. Prible and is contradictory. *Compare* Dr. Prible Dep. at 24–25 (Q: If a locomotive engineer is diagnosed with ischemia is that person to automatically be medically disqualified? A: I wouldn't say automatically. I mean, we look at each case individually and ask to look at the test results and other things that are going on.) *with id.* at 26–27 (Q: So with respect to locomotive engineers, when it comes to ischemia it's basically all or not; if you have it, you're going to be medically disqualified and not allowed to return unless you subsequently test negative for it? A: Yes.). Dr. Prible did not testify to Dr. Lina's handling of Snyder's disqualification.

evidencing ischemia. She did not state, however, that her diagnosis of Snyder's condition was final. Dr. Lina alerted Snyder of his rights under the collective bargaining agreement to obtain a second opinion and, more importantly, of the opportunity to be reconsidered for the engineer position if his condition improved. This bolsters NSR's contention that it viewed Snyder's condition as a possible correctable, temporary impairment. Although the language in the letters regarding Snyder's options appear to be "form" language, the words were given affect with Dr. Lina's consideration of the May 24, 2004 stress test results indicating no ischemia, which resulted in Snyder's reinstatement.

Viewing these facts in the light most favorable to Snyder, I must agree with the defendant, NSR. The most a reasonable juror can conclude is that Dr. Lina and NSR viewed Snyder as having difficulty in the pumping and circulating of blood. NSR did not perceive Snyder as being "significantly restricted" in the manner in which his heart pumped his blood as compared to the average person in the general population. While NSR took a conservative approach in handling Snyder's medical status and disqualifying him, that is not enough to establish "substantially limited." *See Sutton v. United Air Lines,* 527 U.S. 471, 490–91, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("[A]n employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment ... are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job."). Dr. Lina was aware that Snyder did not display any

clinical symptoms of the ischemia. *See* Dr. Lina Dep. at 67. She recognized Snyder only demonstrated evidence of ischemia as opposed to definitely suffering from ischemia. *See Sutton,* 527 U.S. at 482, 119 S.Ct. 2139 (reading the "substantially limited" language of the ADA to require that a plaintiff "be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability"). Based on Snyder's health history, however, the trace of ischemia raised a red flag for Dr. Lina and she wanted further evidence of Snyder's condition before she allowed him to return to his safety-sensitive position. (It is Snyder who delayed in providing NSR with a second opinion or an updated stress test report from a cardiologist.)

In addition, the application of the factors spelled out in the EEOC regulations provides further support to the fact that NSR did not regard Snyder as being substantially limited in the pumping and circulating of blood.[13] First, the nature and severity of Snyder's impairment was such that Dr. Lina viewed Snyder as possibly having an area of his heart that may not be receiving adequate blood flow. The diagnosis was not unequivocal and Dr. Lina was aware that Snyder did not have any symptoms of ischemia. At most, Dr. Lina regarded the heart function as limited and a cause for concern given Snyder's position and medical history. Second, the expected duration of the ischemia was not necessarily permanent. Dr. Lina viewed ischemia as a heart condition that can be improved or worsened depending upon the individual and such factors as time, medication, and risk factor control. This is evidenced in her phone conversation and letters to Snyder that provide Snyder an

---

13. The factors a court should consider to determine if a person is substantially limited in a major life activity include: (1) the nature and severity of the impairment; (2) the duration or expected duration; and (3) the expected or actual permanent or long-term impact of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

opportunity to inform NSR of any improvement in his condition. Finally, no evidence has been presented that Dr. Lina expected Snyder's heart impairment, as she viewed it in September of 2003, to have a permanent or long-term impact on Snyder. As noted above, Dr. Lina was aware that no clinical symptoms of ischemia presented themselves in Snyder and she viewed the diagnosis as capable of changing.

Snyder's reliance on *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180 (3d Cir. 1999), is misplaced. *Pathmark Stores* applies in the situation where an employer mistakenly believes, whether the mistake is innocent or negligent, an employee is disabled. Thus, as a prerequisite for *Pathmark Stores* applicability, the employer's perception of the employee's impairment must rise to the level of "disability" under the ADA. Or as the Third Circuit phrased it: "Liability attaches only to a mistake that causes the employer to perceive the employee as disabled within the meaning of the ADA, i.e., a mistake that leads the employer to think that the employee is substantially limited in a major life activity." *Id.* at 192. Here, any mistake Dr. Lina made in her diagnosis of Snyder's impairment did not translate into Snyder being regarded as disabled. Dr. Lina did not view Snyder as being substantially limited in the major life activity of pumping and circulating blood.

In addition, expert Dr. Nicholas De-Pace's views of Snyder's condition and the actual permanence of Snyder's ischemia are not helpful in this court's analysis. Since the plaintiff is proceeding under the "regarded as" definition of disabled, only the perception of NSR and Dr. Lina influence the court's determination.

In sum, when I apply the demanding standard that "substantially limited" requires, the plaintiff has not met his burden. The record before the court does not allow a reasonable juror to find that NSR regarded Snyder as substantially limited in the pumping and circulating of blood.[14] As a result, the plaintiff has failed to show he was disabled under the ADA and has failed to establish a prima facie case of disability discrimination.[15] Accordingly, the defendant is entitled to judgment as a matter of law.

I will grant defendant NSR's motion for summary judgment and dismiss all claims of Paul Snyder against NSR with prejudice. An appropriate Order follows.

### ORDER

**AND NOW,** this 15th day of November, 2006, upon consideration of Defendant's Motion for Summary Judgment (Docket No. 11), and the responses thereto, it is hereby **ORDERED** that the motion is **GRANTED.**

The Clerk of Court shall mark this case as **CLOSED** for statistical purposes.

---

**14.** This court's decision is in no way an approval of NSR's medical guidelines or their implementation. Under the facts and circumstances of this case, NSR did not run afoul of the ADA. "Congress intended the existence of a disability to be determined in … a case-by-case manner." *Toyota Motor,* 534 U.S. at 198, 122 S.Ct. 681.

**15.** Since the plaintiff has failed to make out a prima facie case of discrimination, it is unnecessary for the court to discuss NSR's affirmative defense of business necessity.