In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2431

Kent Furnish,

Plaintiff-Appellant,

v.

SVI Systems, Incorporated,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois.
No. 96 C 1581--Joe B. McDade, Chief Judge.

Argued September 10, 2001--Decided October 22, 2001


Before Posner, Kanne, and Evans, Circuit
Judges.

Kanne, Circuit Judge.  Plaintiff, Kent
Furnish, brought a suit against his ex-
employer, alleging violations of the
Americans with Disabilities Act ("ADA").
42 U.S.C. sec. 12101. Defendant, SVI
Systems, terminated plaintiff's
employment on July 25, 1996, for the
stated reason of "unsatisfactory work
performance." Plaintiff alleges that he
was terminated because he suffered from
cirrhosis caused by chronic Hepatitis B.
The district court granted summary
judgment in favor of defendant on the
grounds that plaintiff failed to show
that he was disabled under the ADA. We
agree with the district court's
conclusion that plaintiff was not
disabled, and therefore affirm.

I.  History

Defendant SVI Systems ("SVI"), based in
Peoria, Illinois, provides real time
video services to hotels and motels in
the eastern and midwestern portions of
the United States. SVI salespeople enter
into contracts with individual hotels and
motels, and then SVI technicians go on-
site to install the equipment in the
facility. After installation, SVI
monitors the equipment from its offices
in Peoria.

In January, 1995, plaintiff accepted a position with SVI as Director of Technical Operations. Plaintiff was 44 years old with 23 years' experience in the cable television and transmission systems industry and had a degree inelectrical engineering. Plaintiff was responsible for pre-installation technical work and for installing SVI's video systems in hotels. Plaintiff was also responsible for hiring and training new installers. In September, 1995, Eric Goldberg, plaintiff's supervisor, gave plaintiff a favorable job performance review. Goldberg further recommended that plaintiff receive a 4% raise, rather than the 3% raise that most employees received.

On August 29, 1995, gastroenterologist Dr. Ben Dolin diagnosed plaintiff with chronic Hepatitis B. Dr. Dolin later took a biopsy of plaintiff's liver, and, on January 9, 1996, a pathologist analyzed the tissue sample and concluded that plaintiff suffered from chronic Hepatitis B and severe septal fibrosis suggestive of liver disease. Hepatitis B damages liver cells so that there are fewer cells to perform the liver's detoxification function and to produce glucose. Fibrosis is liver scarring, which affects the liver's ability to perform its blood filtering function.

On January 26, 1996, plaintiff began treating his disease with the drug Interferon. The Interferon treatment caused plaintiff to experience flu-like symptoms such as fatigue, nausea, and achiness. By May, 1996, Dr. Dolin concluded that the Interferon treatment was not working and referred plaintiff to the University of Iowa Medical School for treatment. On June 17, 1996, plaintiff was seen by Dr. Douglas LaBreque, a professor of Internal Medicine and Director of Liver Services at the University of Iowa Medical School. Blood tests taken by Dr. LaBreque that day detected liver enzymes that indicated that plaintiff's liver was functioning normally. Dr. LaBreque testified at his deposition that as of June, 1996, plaintiff's liver functioning was "adequate," meaning that he had enough normal liver cells "to do the job." Dr. LaBreque placed plaintiff on an experimental drug called Lamivudae, and

by December, 1997, plaintiff's liver disease was dormant.

In January, 1996, soon after he was diagnosed with Hepatitis B, plaintiff met with his new supervisor, Don Decker, and with Beth Salmon, SVI's president. Plaintiff informed them about his disease and warned them that in the coming months, he may suffer from a failure to sleep, nausea, mood swings, and irritability because of the disease and its treatment. He also explained to them that these same symptoms may require him to miss some work. Soon thereafter, plaintiff's wife, a registered nurse, also informed Salmon that plaintiff may need to miss some work in the future because of his flu-like symptoms and because of doctor appointments. She also told Salmon that she was worried that plaintiff would be unable to travel. At his deposition, however, Dr. LaBreque testified that plaintiff was not under any work or travel restrictions.

In March, 1996, after plaintiff told his supervisor that his health prevented him from traveling to locations far from Peoria in order to complete installations, Decker responded that plaintiff was to do whatever was necessary to complete the jobs. That same month, Decker reprimanded plaintiff for missing a scheduled meeting with an installer. Plaintiff claimed that he missed the meeting because he had vomited and had to go home to rest.

When Decker became plaintiff's supervisor in January, 1996, SVI had hundreds of outstanding installations that needed completion. In order to complete these installations, Decker wanted the installers to complete twelve installations per week. By June 1, 1996, plaintiff had fallen behind on these installations, and, by that time, SVI had contracted with hundreds of additional properties for installations. Because he had fallen behind on these installations, on July 1, 1996, plaintiff was directed to focus solely on pre-installation technical work and was relieved of his duties with respect to installations.

Plaintiff was fired on July 25, 1996. Decker prepared a memorandum memorializing the reasons for plaintiff's discharge, stating that he was being

fired for "unsatisfactory work performance." This memorandum listed problems with plaintiff's work performance including: frequent installation failures, failure to reprimand employees or establish controls that would make them accountable, and plaintiff's weak communication skills and lack of organization. Further, the memorandum gave three rationales for plaintiff's termination: 1) plaintiff's current responsibilities did not justify his salary; 2) there were no additional responsibilities that plaintiff had shown an ability to assume; and 3) defendant was not willing to offer plaintiff a reduced salary that matched the duties he was performing. At that time there were still properties that awaited technical attention from plaintiff. Plaintiff admitted that he did not meet Decker's new installation goals, but claimed that the goals were unreasonable, and that his failure to meet the goals resulted from incorrect advance work done by others and from misinformation concerning the installation sites.

On December 18, 1996, plaintiff brought a lawsuit alleging, inter alia, discrimination on the basis of a disability./1 He brought suit under the ADA, which prohibits discrimination in employment of a "qualified individual with a disability." 42 U.S.C. sec. 12112(a). On May 17, 1999, the district court entered an order granting summary judgment in favor of SVI. The order concluded that plaintiff was not disabled under the ADA because his disease did not substantially limit a major life activity.

II.  Analysis

A.  Standard of Review

We review a grant of summary judgment de novo, viewing all of the facts, and drawing all reasonable inferences therefrom, in favor of the nonmoving party. See Cent. States, Southeast and Southwest Areas Pension Fund v. White, 258 F.3d 636, 639 (7th Cir. 2001). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)).

B.  Was Plaintiff a "Qualified Individual with a Disability?"

The ADA prohibits an employer from "discriminat[ing] against a qualified individual with a disability because of the disability." 42 U.S.C. sec. 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." Id. sec. 12111(8). Further, a "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."/2 Id. sec. 12102(2)(A). Thus, to prevail on his ADA claim, plaintiff must show that (1) he is "disabled"; (2) he is qualified to perform the essential function of the job either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. See Moore v. J.B. Hunt Transp., Inc., 221 F.3d 944, 950 (7th Cir. 2000).

The Supreme Court has devised a three-part test for determining whether a plaintiff is "disabled" under 42 U.S.C. sec. 12102(2)(A), thereby satisfying the first prong of an ADA discrimination claim. See Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998). First, we determine whether plaintiff suffered from a physical or mental impairment. See id. If so, we then determine whether the major life activity claimed by plaintiff constituted a major life activity under the ADA. See id. at 637. Finally, we analyze whether plaintiff's impairment substantially limited the major life activity. See id. at 639.

Plaintiff suffers from cirrhosis caused by chronic Hepatitis B. Dr. Dolin testified at his deposition that cirrhosis "is significant scarring [of the liver] to the point where it compromises the liver." This reduced liver functioning affects the ability of plaintiff's body to eliminate toxins and maintain appropriate glucose levels.

Therefore, we agree with the district court's conclusion that plaintiff suffered from a physical impairment. See, e.g., Lawson v. CSX Transp., Inc., 245 F.3d 916, 923 (7th Cir. 2001) (holding plaintiff's insulin-dependent diabetes was a physical impairment because it affected "many of the organ systems in his body").

Plaintiff's ADA claim fails, however, because his alleged major life activity is not a major life activity under the ADA. On appeal, plaintiff alleges that his Hepatitis B impairment affected the major life activity of "liver function." The Equal Employment Opportunity Commission Regulations interpreting the ADA ("ADA regulations") describe major life activities as activities such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. sec. 1630.2(i). While this list is intended to be illustrative, rather than exhaustive, see Sinkler v. Midwest Property Management Limited Partnership, 209 F.3d 678, 684 (7th Cir. 2000), "liver function" bears little resemblance to the major life activities enunciated in the ADA regulations.

The Supreme Court's decision in Bragdon, 524 U.S. at 637-38, clarifies what type of activities constitute major life activities under the ADA. In that case, the plaintiff, who had the HIV virus, brought an ADA claim against a dentist who refused to treat her in his office. See id. at 629. The plaintiff claimed that her HIV infection substantially limited the major life activity of reproduction. See id. at 637. The Court concluded that reproduction was a major life activity for ADA purposes. See id. at 638. Citing regulations that were nearly identical to the ADA regulations, the Court reasoned that reproduction was a major life activity because it was "central to the life process." Id. In other words, "the touchstone for determining an activity's inclusion under the statutory rubric is its significance." Id. (citation omitted).

This court has interpreted Bragdon to mean that a major life activity is something that is "integral to one's daily existence." Lawson, 245 F.3d at 923. Using this standard, this court has

held that "eating constitutes a major life activity for purposes of the ADA." Id. (quotation omitted). Similarly, we have held that working can be a major life activity. See, e.g., Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998). Although liver function is "integral to one's daily existence" in that one needs a healthy liver to remove toxins from the blood, liver function is not "integral to one's daily existence" under Bragdon and its progeny. The alleged major life activity here--liver function--is a characteristic of the impairment, much as a decline in white blood cells is a characteristic of the HIV virus. See Bragdon, 524 U.S. at 635. However, in Bragdon, the Court did not hinge its conclusion that the plaintiff was disabled on a characteristic of her impairment. For example, the Court did not focus on the fact that her "blood health" was impacted. Rather, the Court evaluated the impairment's impact on her ability to reproduce. The activities that have been held to be major life activities under the ADA (e.g., eating, working, reproducing) are not the impairments' characteristics--they are activities that have been impacted because of the plaintiffs' impairments. Therefore, we reject the notion that "liver function" is a major life activity under the ADA.

   Plaintiff's argument misses that essential link. He argues that Hepatitis B should be a disability because it is a chronic illness that affects the functioning of a major organ. However, under the ADA, even a serious illness such as Hepati tis B does not equate with a disability. Only when the impact of the illness substantially limits a major life activity--such as working--is an individual considered disabled within the meaning of the ADA.

   Plaintiff, however, has never asserted "working"--or any other activity--as being substantially limited. Liver function is the only alleged "major life activity" that this court can consider, as it was the only one articulated by plaintiff. See Bragdon, 524 U.S. at 638. In that case, the Court noted that a party who had the HIV virus could have alleged that the infection imposed substantial limitations on a number of major life activities other than

reproduction. Id. at 637. However, because "the case ha[d] been treated as one in which reproduction was the major life activity limited by the impairment," the Court "circumscribe[d] [their] discussion to the activity of reproduction." Id. at 637-38. Similarly, although a party could theoretically allege a number of major life activities that were substantially limited by Hepatitis B and cirrhosis, plaintiff chose to hinge his case on liver function being a major life activity. As it is not a major life activity under the ADA, plaintiff is not disabled and cannot prevail on his ADA claim.

Even if liver function served as a major life activity under the ADA, plaintiff's claim would fail because he cannot prove that his disease "substantially limited" the functioning of his liver. The ADA regulations state that a person is "substantially limited" by an impairment if that person is either "'[u]nable to perform a major life activity' or is 'significantly restricted as to the condition, manner or duration' under which the individual can perform the major life activity as compared to the average person in the general population." Skorup, 153 F.3d at 514 (quoting 29 C.F.R. sec. 1630.2(j)(1)). Thus, the analysis for determining whether a person's impairment substantially limits a major life activity has three facets: 1) the nature and severity of the impairment; 2) the duration of the impairment; and 3) the permanent or long-term impact resulting from the impairment. See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 506 n.3 (7th Cir. 1998) (citing 29 C.F.R. sec. 1630.2(j)(2)). The district court relied on the deposition testimony of Drs. LaBreque and Dolin to conclude that plaintiff's liver function was not substantially limited. Dr. LaBreque testified that as of June, 1996, one month before plaintiff was fired, his "liver function was right on the borderline, if you will, but it was--it was adequate." Dr. Dolin testified that as of June, 1997, plaintiff's "liver function tests [were] absolutely normal."

The record reveals that plaintiff's liver function was not substantially limited. To summarize plaintiff's relevant medical history, Dr. Dolin

prescribed Interferon treatment in January, 1996, but by May, 1996, Dr. Dolin concluded that the treatment was not working. In June, 1996, he referred plaintiff to Dr. LaBreque, who concluded that plaintiff's liver function was "adequate." Although plaintiff suffered from some fatigue due to his disease, Dr. LaBreque placed no work or travel restrictions on plaintiff. In fact, plaintiff only missed 12 hours of work during the entire year in 1996, and there was no evidence demonstrating that plaintiff ever suffered from restrictions on his ability to care for himself or perform manual tasks./3 Dr. LaBreque placed plaintiff on the drug Lamivudae, and by June, 1997, tests revealed that plaintiff's liver function was "absolutely normal." Plaintiff ceased taking Lamivudae in December, 1997, at which time his virus was completely dormant.

Looking at the three factors--the nature and severity of the impairment, its duration, and the long-term effects--it is clear that plaintiff's disease did not substantially limit his liver function. In evaluating the effect of plaintiff's impairment on his liver function, "we must examine the plaintiff's condition as it exist[ed] after corrective or mitigating measures used to combat the impairment" were taken. Lawson, 245 F.3d at 924. At the time of plaintiff's termination, Dr. LaBreque considered plaintiff's liver function to be "adequate" enough "to do the job." As Dr. LaBreque stated in his deposition: "if you've got cirrhosis, [plaintiff is] doing as well as you can do with cirrhosis." The duration of plaintiff's impairment also militates against finding that his liver function was substantially impaired. After treating his disease with Lamivudae, plaintiff's liver disease became dormant. Finally, plaintiff may not suffer long-term effects from his liver disease. Dr. Dolin testified that in June, 1997, plaintiff's liver function tests were "absolutely normal" with "no evidence of liver failure." Therefore, plaintiff's Hepatitis B and cirrhosis did not substantially limit his liver function.

III.  Conclusion

Because of the foregoing, we AFFIRM the

district court's grant of summary judgment in favor of defendant on the grounds that plaintiff was not disabled under the ADA.

FOOTNOTES

/1 Plaintiff also alleged violations of the Employee Retirement and Income Security Act ("ERISA"). 29 U.S.C. sec. 1132(a)(1)(b). However, the alleged ERISA violations are not at issue on this appeal.

/2 The ADA also defines "disabled" as "a record of such impairment" or "being regarded as having such impairment." 42 U.S.C. sec.sec. 12102(2)(B) and (C). On appeal, plaintiff relies solely on the definition under 42 U.S.C. sec. 12102(2)(A) as the basis for his ADA claim.

/3 It should be noted, once again, that plaintiff never asserted "working" as his major life activity.