In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2773

MARY B. VALENCIA, *et al.*

*Plaintiffs-Appellees*,

*v.*

CITY OF SPRINGFIELD, ILLINOIS,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:16-cv-03331 — **Richard Mills**, *Judge*.

ARGUED FEBRUARY 8, 2018 — DECIDED MARCH 1, 2018

Before FLAUM, EASTERBROOK, and MANION, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiffs allege the City of Springfield ("Springfield" or "the City") unlawfully discriminated against three disabled individuals when it ruled they could no longer occupy a single-family residence located within 600 feet of an existing disabled group home. Finding that plaintiffs possessed a reasonable likelihood of success on the merits, the district court granted them a preliminary injunction and enjoined the City from initiating eviction proceedings

while this case is pending. The City appeals. For the reasons stated below, we affirm.

## I. Background

### A. Factual Background

Like most municipalities, Springfield's zoning code ("the Code") divides the city into multiple zoning districts, including residential districts. Springfield, Ill., Code of Ordinances § 155.004. The primary permitted use within residential districts is "single-family detached residences." *Id.* § 155.016. The Code defines "family" as:

> One or more persons each related to one another by blood, marriage, or adoption, or is a group of not more than five persons not all so related occupying a single dwelling unit which is not a boardinghouse or lodging house as defined in this section.

*Id.* § 155.001.

In addition to single-family detached residences, the Code also allows certain residential districts to be used for "family care residence[s]." *Id.* § 155.016. The Code defines a "family care residence" as:

> A single dwelling unit occupied on a relatively permanent basis in a family-like environment by a group of no more than six unrelated persons with disabilities, plus paid professional support staff provided by a sponsoring agency either living with the residents on a 24-hour basis or present whenever residents with disabilities are present at the dwelling, and complies

> with the zoning regulations for the district in which the site is located.

*Id.* § 155.001. The Code imposes additional restrictions on family care residences. In relevant part, such residences must be "located upon a zoning lot which is more than 600 feet from the property line of any other such facility." *Id.* § 155.053. According to the Code, this is to ensure that family care residences, "which operate most effectively in residential environments, do not adversely affect those environments through over concentration." *Id.*

Plaintiff Individual Advocacy Group, Inc. ("IAG") is a non-profit organization that provides residential services to adults with disabilities, including assistance in dressing, food preparation, shopping, home maintenance, and cleaning. Such services allow disabled individuals to live in family-like settings in typical residential communities, a configuration commonly referred to as Community Integrated Living Arrangements ("CILAs"). Notably, unlike other residential service agencies, IAG does not own or operate group homes. Rather, IAG clients (or their legal guardians) rent individual dwellings on their own behalf, and then IAG provides in-home support.[1]

In 2012, IAG contacted several property owners in Springfield about providing housing for CILAs. In August 2013, Christine and Robyn Hovey agreed to rent a home located at 2328 Noble Avenue ("the Noble home") to three IAG

---

[1] Although IAG clients (or their legal guardians) are technically the lessees of a particular residence, IAG enters into written agreements with landlords to pay any security deposit and, if necessary, supply a new disabled tenant in the event a lessee departs the home.

clients. The Noble home is located in a residential district
that allows both single-family detached residences and fam-
ily care residences. It is a one-story ranch house that resem-
bles other dwelling units in the neighborhood. The district
court found there is nothing about the exterior of the Noble
home that indicates it is inhabited by disabled individuals.
Although IAG employees are present any time the home is
occupied, they do not drive marked vehicles, and there are
generally no more than two staff cars present at any time.

In March 2014, after the Hoveys completed significant
renovations,[2] IAG clients J.M., J.D., and former plaintiff
A.D.[3] moved into the Noble home. Each possessed a substan-
tial physical or mental impairment, and two were non-am-
bulatory. At the time, A.D. was a sixty-two year-old male
who was confined to a wheelchair and almost completely
nonverbal.

Unbeknownst to the Hoveys, IAG, or its clients, Sparc—
another non-profit organization supporting those with de-
velopmental disabilities—had been operating a family care
residence ("the Sparc home") across the street from the No-
ble home for approximately twelve years. Like the Noble
home, the Sparc home is indistinguishable from other homes
in the area. However, according to the City, the property

[2] These renovations included, *inter alia*, widening doorways, enlarging
two bathrooms, and lowering kitchen counters to make the home wheel-
chair accessible.

[3] A.D. died on September 12, 2017. Plaintiff Mary B. Valencia, who is
A.D.'s sister and legal guardian, originally filed this suit on A.D.'s behalf.
On October 31, 2017, the district court terminated A.D. as a party and sub-
stituted Valencia.

lines of the Noble home and the Sparc home are separated by only 157 feet.

In August 2016, the City notified the Hoveys that a complaint had been filed because the Noble home was located within 600 feet of the Sparc home, in violation of § 155.053 of the Code. The City thus informed the Hoveys that the Noble home residents would be evicted unless the Hoveys applied for a Conditional Permitted Use ("CPU"). Under the Code, "[a]ny family care residence … not in compliance with [§ 155.053] … may seek a conditional permitted use under … the zoning ordinance." *Id.* To qualify for a CPU, a family care residence must establish that: (1) "the proposed location and use will not have any adverse impact upon residents of nearby facilities when located within 600 feet of another such facility"; and (2) "[t]he proposed location will not have any detrimental affect [sic] upon existing privacy, light or environment of surrounding residences." *Id.* § 155.211.1.

On October 7, 2016, the Hoveys and IAG submitted a joint CPU application. On November 10, 2016, the Springfield-Sangamon County Regional Planning Commission ("the County Commission") recommended the CPU be denied because "[t]he evidence provided in the petition [did] not provide sufficient detail to allow staff to make a reasonable determination whether the design and method of operation of the proposed use [would] minimize the adverse effects on the character of the surrounding area."

On November 16, 2016, the Springfield Zoning and Planning Commission ("the Springfield Commission") held a public hearing. At the hearing, Dr. Charlene Bennett, IAG's executive director, testified that when the Noble home opened, IAG was not aware of the Sparc home across the

street. She further testified that, except for one instance in early 2014 when a Sparc resident entered the Noble home without supervision, the residents of the Noble home have had no contact with the residents of the Sparc home.

Plaintiffs also presented testimony from Daniel Lauber, a land use planning and zoning expert. Lauber testified that because the Noble home was leased by IAG's clients, not IAG itself, the City should treat its residents as a "family" under § 155.001 and classify the home as a single-family detached residence rather than a family care residence. Lauber further testified that, even if the home was deemed a family care residence, a CPU was warranted because the home was consistent with the City's comprehensive plans and did not adversely affect the surrounding community.

In response, certain residents of the 2300 block of Noble Avenue asked that the CPU be denied because caregivers "rac[ed] up and down their block to get to work on time," "listen[ed] to … loud music in their vehicles," "park[ed] on the wrong side of the street," and blocked driveways and sidewalks.

At the conclusion of the hearing, the Springfield Commission voted 4-3 to recommend denial of the CPU. The Springfield City Council considered the recommendations of the County Commission and the Springfield Commission on December 20, 2016. Once again, IAG requested the City either deem the Noble home a single-family detached residence or grant a CPU. Following a public comment period, the City Council voted 8-2 to affirm the Springfield Commission's recommendation and deny the CPU.

## B. Procedural Background

On December 22, 2016, plaintiffs filed a complaint in the United States District Court for the Central District of Illinois. Plaintiffs alleged the City discriminated against the Noble home residents on the basis of their disabilities, in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–31, Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). In addition to monetary damages, plaintiffs sought an order directing the City to grant their requested CPU and permanently refrain from treating the Noble home as a non-conforming use under the Code.

Plaintiffs' raised multiple theories of liability. First, they claimed the Code facially discriminates against disabled individuals because it imposes a 600-foot spacing requirement on unrelated disabled persons living in family care residences, but not on unrelated non-disabled persons living in single-family dwellings.[4] Second, they argued that even if the 600-foot spacing requirement is facially neutral, it has a disparate impact on persons with disabilities. Third, they claimed that by refusing to grant the Noble home a CPU, the City failed to make a reasonable accommodation.

---

[4] Plaintiffs' theory relied upon the interaction of the terms "family" and "family care residence" in the Code. Interpreting these two ordinance provisions, plaintiffs contended that five or fewer unrelated, *non*-disabled individuals can constitute a "family" and thus live in a single-family detached residence (without a 600-foot spacing requirement), but five unrelated, *disabled* persons must live in a family care residence.

On January 11, 2017, plaintiffs moved for a preliminary injunction to enjoin the City from instituting eviction proceedings against the Noble home residents during the pendency of the case. They limited the bases of their motion to their theories of disparate treatment and reasonable accommodation.[5]

In response, the City challenged plaintiffs' motion on only one issue: whether plaintiffs demonstrated a reasonable likelihood of success on the merits. On August 3, 2017, the district court granted plaintiffs' motion, finding that plaintiffs possessed a reasonable likelihood of success under both theories of liability.[6] This appeal followed.[7]

---

[5] Plaintiffs did this because, in their view, the City's zoning code is not facially neutral. *See Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996) (noting that cases involving facially discriminatory statutes present cases of disparate treatment, not disparate impact).

[6] The court further found that the Noble home residents would incur irreparable harm because "it would be very difficult" for them "to find a suitable residence" before eviction proceedings were complete. Additionally, "any post-trial relief would come too late to avoid the injuries that would result if preliminary injunctive relief [was] not granted." Finally, the court concluded that a preliminary injunction "would serve the public interest."

[7] The City claims it does not appeal "because it desires to immediately remove the Plaintiffs from the Noble home." Rather, it believes the district court's interpretation of the Code "effectively renders moot any factual determination that might be made" after a trial on the merits. According to the City, if the district court's interpretation stands, "it is unlikely that any set of facts would save the ordinance from violating the FHA."

## II. Discussion

### A. The Preliminary Injunction Standard

"An equitable, interlocutory form of relief, 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984)); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) ("A preliminary injunction is an extraordinary remedy."). "It is never awarded as a matter of right." *Whitaker*, 858 F.3d at 1044. "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts*, 549 F.3d at 1085–86.

"To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements." *Id.* at 1086. It must show that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.*

If the moving party satisfies each of these requirements, the court "proceeds to the balancing phase of the analysis." *Id.* In the balancing phase, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* "In so doing, the court employs

a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (alteration in original) (quoting *Roland Mach.*, 749 F.2d at 387). "Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 1986)).

As stated above, the City contests only a single aspect of the preliminary injunction inquiry: whether plaintiffs are likely to succeed on the merits. "A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). Although "[t]his is a low threshold," *id.*, it "does not mean … that applicants for interim injunctive relief with relatively weak cases will always obtain injunctions." *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999). "If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993).

In reviewing the grant or denial of a preliminary injunction, this court "examines legal conclusions de novo, findings of fact for clear error, and the balancing of harms for abuse of discretion." *Coronado v. Valleyview Pub. Sch. Dist. 365-U*, 537 F.3d 791, 795 (7th Cir. 2008); *see also Whitaker*, 858 F.3d at 1044. In other words, "[a] district court abuses its discretion when, in conducting its preliminary injunction analysis, it commits

a clear error of fact or an error of law." *Girl Scouts*, 549 F.3d at 1086. "Absent such errors, we accord a district court's decisions during the balancing phase of the analysis great deference." *Id.*; *see also Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) ("[W]e give substantial deference to the court's weighing of evidence and balancing of the various equitable factors.").

## B. The Statutes at Issue

The FHA, passed in 1968, "was enacted 'to provide, within constitutional limitations, for fair housing throughout the United States.'" *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (quoting 42 U.S.C. § 3601). Although the original Act only prohibited discrimination on the basis of race, color, religion, or national origin, the Fair Housing Amendment Act of 1988 ("FHAA") extended FHA protections to persons with disabilities. *See* Pub. L. No. 100-430, 102 Stat. 1619. The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1).

Similarly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132.

Finally, under the Rehabilitation Act, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Importantly, all three statutes apply to municipal zoning decisions. *See Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 n.12 (7th Cir. 2006) (en banc); *Oconomowoc*, 300 F.3d at 782. A plaintiff may prove a violation of the FHA, ADA, or Rehabilitation Act by showing: (1) disparate treatment; (2) disparate impact; or (3) a refusal to make a reasonable accommodation. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002). For each respective theory, the same analysis generally applies under all three statutes. *See id.* at 48–53.

## C. Reasonable Accommodation

The district court found that plaintiffs possessed a reasonable likelihood of success under theories of both intentional discrimination and reasonable accommodation. We need not address both issues here. "[W]e may affirm on any basis that appears in the record," *see Kidwell v. Eisenhauer*, 679 F.3d 957, 965 n.1 (7th Cir. 2012), and plaintiffs' reasonable accommodation claim offers a sufficient avenue for affirming the district court's ruling.[8]

---

[8] Although the City appealed in hopes of resolving the proper interpretation of its Code, we believe such a ruling would be best made with the assistance of a full record. The City's fear that the district court's preliminary interpretation "renders moot any factual determination that might be made" at trial is overstated. "[T]he granting of a preliminary injunction is not a decision on the merits of the plaintiff's suit." *Ayres v. City of Chicago*, 125 F.3d 1010, 1013 (7th Cir. 1997). Rather, "[i]t is merely a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation, in the plaintiff's favor, for

The FHAA requires public entities "to reasonably accommodate a disabled person by making changes in rules, policies, practices or services as is necessary to provide that person with access to housing that is equal to that of those who are not disabled." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 561 (7th Cir. 2003); *see also* 42 U.S.C. § 3604(f)(3)(B). "Although the plain language of the FHAA provides little guidance concerning the reach of its accommodation requirement, the contours of the obligation have been given substantial elaboration by this court and other courts of appeals." *Wis. Cmty. Servs.*, 465 F.3d at 749. "The basic elements of an FHAA accommodation claim are well-settled." *Id.* "The FHAA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling." *Oconomowoc*, 300 F.3d at 783.[9]

"Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Id.* at 784. "An accommodation is reasonable if it is both efficacious and proportional to the costs to

---

such time as it may take to determine whether the suit is, or is not, meritorious." *Id.* "The propriety of preliminary relief and resolution of the merits are … 'significantly different' issues," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 n.10 (2007) (quoting *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 393 (1981)), and therefore "findings made at the preliminary injunction stage do not bind the district court as the case progresses." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011).

[9] As stated above, the requirements for reasonable accommodation under the FHAA are the same as those under the ADA and Rehabilitation Act. *See Oconomowoc*, 300 F.3d at 783; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 497 (7th Cir. 1996).

implement it." *Id.* On the other hand, "[a]n accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Id.*

Some costs related to reasonableness "may be objective and easily ascertainable." *Wis. Cmty. Servs.*, 465 F.3d at 752. For example, "some governmental costs associated with the specific program at issue may be a matter of simply looking at a balance sheet." *Id.* Other costs "may be more subjective and require that the court demonstrate a good deal of wisdom in appreciating the intangible but very real human costs associated with the disability in question." *Id.* This refers to "those intangible values of community life that are very important if that community is to thrive and is to address the needs of its citizenry." *Id.* Of particular relevance here, "[a] zoning waiver is unreasonable if it is so 'at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Oconomowoc*, 300 F.3d at 784 (quoting *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838–39 (7th Cir. 2001)).

"Whether the requested accommodation is necessary requires a 'showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.'" *Dadian*, 269 F.3d at 838 (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). "In other words, the plaintiffs must show that without the required accommodation they will be denied the equal opportunity to live in a residential neighborhood." *Oconomowoc*, 300 F.3d at 784. "This has been described by courts essentially as a causation inquiry." *Wis. Cmty. Servs.*, 465 F.3d at 749.

Finally, "[t]he 'equal opportunity' element limits the accommodation duty so that not every rule that creates a general inconvenience or expense to the disabled needs to be modified." *Id.*

> Instead, the statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market. We have enforced this limitation by asking whether the rule in question, if left unmodified, hurts "handicapped people *by reason of their handicap,* rather than … by virtue of what they have in common with other people, such as a limited amount of money to spend on housing."

*Id.* (alterations in original) (quoting *Hemisphere Bldg. Co., Inc. v. Vill. of Richton Park,* 171 F.3d 437, 440 (7th Cir. 1999)). In the context of a zoning waiver, "'equal opportunity' means the opportunity to choose to live in a residential neighborhood." *Oconomowoc,* 300 F.3d at 784.

"The burden is on the plaintiffs to show that the accommodation it seeks is reasonable on its face." *Id.* at 783. "Once the plaintiffs have made this prima facie showing, the defendant must come forward to demonstrate unreasonableness or undue hardship in the particular circumstances." *Id.*

> This burden-shifting analysis applies to the "necessary" and "equal opportunity" elements of the requirement as well, as "a plaintiff is in the best position to show what is necessary to

afford its clients (i.e., the handicapped popula-
tion that it wishes to serve) an equal oppor-
tunity to use and enjoy housing, [while] a de-
fendant municipality is in the best position to
provide evidence concerning what is reasonable
or unreasonable within the context of the zon-
ing scheme."

*Id.* at 783 n.5 (alteration in original) (quoting *Lapid-Laurel,
L.L.C. v. Zoning Bd. of Adjustment*, 284 F.3d 442, 458 (3d Cir.
2002)).

Here, the CPU sought by plaintiffs would afford the Noble
Home residents an equal opportunity to establish a residen-
tial home. *See Oconomowoc*, 300 F.3d at 784. "Often, a commu-
nity-based residential facility provides the only means by
which disabled persons can live in a residential neighbor-
hood, either because they need more supportive services, for
financial reasons, or both." *Id.* Thus, "[w]hen a zoning author-
ity refuses to reasonably accommodate these small group liv-
ing facilities, it denies disabled persons an equal opportunity
to live in the community of their choice." *Id.*

The City counters that plaintiffs are not seeking an *equal*
opportunity to enjoy a dwelling. Interpreting the definition of
"family" found in § 155.001 of the Code, the City claims "there
is no provision under [the City's] zoning code for three unre-
lated *non*-disabled adults to live in a single family home."[10]

---

[10] According to the City, the phrase "a group of not more than five
persons not all so related" in the Code's definition of "family" only means
that "a group of some related and some unrelated persons not exceeding
five" may occupy a single dwelling unit. That is, the definition means
"that not *all* [persons] need be related, but *some* of them are." Thus, under
the City's interpretation, "[f]ive unrelated persons cannot be considered a

By extension, according to the City, plaintiffs "are seeking an opportunity which would not be afforded to similarly situated non-disabled persons under any circumstances." We agree with the district court that this theory is dubious. The present record does not provide any evidence that the City "has ever taken any measure to enforce [a] prohibition against three unrelated non-disabled adults residing in a single family home." Practically speaking, therefore, plaintiffs seek the same opportunity as unrelated non-disabled individuals.

On the questions of reasonableness and necessity, our decision in *Oconomowoc* is instructive. There, Milwaukee denied an occupancy permit for a disabled adult residential facility because two other group homes were operating within 2,500 feet of the proposed home (one of which was located within 358 feet). *Id.* at 778–79.

The facility appealed to Milwaukee's Board of Zoning Appeals, arguing that a variance was necessary as a reasonable accommodation under the FHAA. *Id.* The facility presented evidence of the scarcity of disabled housing, as well as detailed information about the needs of two individual plaintiffs suffering from traumatic brain injuries. *Id.* At the same time, prospective neighbors of the group home expressed concerns that the disabled residents "might become violent" and "threaten the safety of residents of the community." *Id.* at 779–80. Other neighbors "raised concerns about the amount of traffic," "parking restrictions that could constitute a hazard for the group homes residents," and the "lack of sidewalks." *Id.* at 780.

---

family under the ordinance" and therefore "could not legally occupy a single family home."

The Board of Zoning Appeals denied the request for a variance, stating that the proposed home would constitute a "flagrant violation of the state's distance requirement." *Id.* The Board also cited the neighbors' safety concerns, and concluded that the proposed facility could impose "undue costs, expenses, and other burdens on the City." *Id.*

After the facility sued for violations of the FHAA, the district court granted partial summary judgment in its favor, finding that Milwaukee failed to provide a reasonable accommodation. *Id.* at 781. We affirmed. In our opinion, we first stated that Milwaukee's zoning code and variance procedure were "not in and of [themselves] an accommodation." *Id.* at 785. We further held that the facility "sufficiently established that the [variance] was reasonable and necessary to provide [the disabled residents] with an equal opportunity to enjoy housing in a residential community in Milwaukee." *Id.* at 787. Specifically, we stressed that the individual plaintiffs "require[d] a living arrangement where supportive services [were] available twenty-four hours a day" and was "wheelchair accessible," and noted that neither plaintiff could afford to purchase their own home. *Id.*

In contrast, we held that Milwaukee failed to prove "either that the accommodation was unreasonable or that it created an undue hardship." *Id.* We stated that the prospective neighbors' public safety concerns could not "be based on blanket stereotypes about disabled persons rather than particularized concerns about individual residents." *Id.* at 786. Moreover, "[Milwaukee's] own engineer testified that the proposed group home would not have a significant adverse impact on traffic and therefore [would] not, in this fashion, impose any financial or administrative burdens on the City." *Id.* Similarly,

Milwaukee did not demonstrate that the group home at issue was "any more likely to generate calls to the police than other area residents." *Id.*

This case is akin to *Oconomowoc.* As the district court found, the Noble home is necessary to fulfill "IAG's mission to provide residential services to disabled adults in a community-based setting." This necessity is further highlighted by the district court's finding that "group homes are in short supply." In fact, "[i]t took several months for IAG to find a home that would accommodate the needs of its clients."

In addition, at this stage in the proceedings, the record shows that IAG's CPU request is reasonable. It would plainly effectuate plaintiffs' goal of establishing a CILA for Noble home residents, and would further advance the integration of disabled individuals into the Springfield community. Moreover, these benefits likely outweigh the potential costs of implementation. The financial and administrative burden on the City is negligible. According to the evidence before the Court, neither police nor emergency services have been called to the Noble home in the three years since it opened. To the contrary, at the City Council hearing on plaintiffs' CPU request, an alderman acknowledged that there have been "no issues" with the home. Further, the district court found that, because IAG made no requests for City services (such as street signs or traffic signals), "[i]t would cost the City no money to allow A.D. and the other residents to remain in the Noble home."

Nor is there sufficient evidence of intangible costs to the neighborhood. Although neighbors of the Noble home raise various traffic concerns, the City's own Traffic Engineer did not object to plaintiffs' CPU request. Moreover, while the City also argues that the requested accommodation will have a

negative effect on the residents of the Sparc home, we agree with the district court's conclusion that "any potential 'adverse impact' to the residents of the Sparc house due to the close proximity of the Noble home is entirely speculative." According to the record, there has been virtually no interaction between the residents of the two homes since the Noble home was occupied. As a result, "[t]here is simply no basis to conclude that the continued existence of the Noble home will have any effect on the ability of the Sparc residents to integrate into the community."

Regardless, it is not clear that greater interface between the residents of the Noble and Sparc homes would be problematic. Sure, a report cited by the City from the Illinois Planning Council on Developmental Disabilities recognizes "that it is important for group homes to locate in a 'normal' residential neighborhood" in order to encourage integration between disabled and non-disabled residents. But there is no evidence that this would not occur if both the Noble and Sparc homes remain in place. Indeed, the report only states that "clusters of *four or five* group homes on a single block could … undermine the ability of neighboring group homes to function properly" (emphasis added). This is a far cry from the two homes at issue here.

In sum, plaintiffs have shown a "better than negligible" likelihood of success on the merits of their reasonable accommodation theory. *See Whitaker*, 858 F.3d at 1046. Therefore, the district court's grant of a preliminary injunction was proper.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.