

FILED

Jun 14 2024, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

Gerald A. Sanders,

*Appellant-Defendant,*

v.

AHEPA 78 VI Apartments, Inc.,

*Appellee-Plaintiff.*

---

June 14, 2024

Court of Appeals Case No.
23A-EV-1502

Appeal from the
Lake Superior Court

The Honorable
Nicholas J. Schiralli, Judge

The Honorable
Catheron A. Paras, Magistrate

**Opinion by Senior Judge Robb**
Judges Riley and Brown concur.

**Robb, Senior Judge.**

# Statement of the Case

Gerald Sanders appeals the trial court's judgment in favor of AHEPA 78 VI Apartments, alleging his eviction was erroneous because AHEPA violated both the Fair Housing Amendments Act (FHAA) and the Rehabilitation Act and failed to show his material noncompliance with the lease. Finding no error, we affirm the trial court's order of eviction.

# Issues

Sanders presents two issues for our review, which we restate as:

> I. Whether the trial court erred by failing to find AHEPA violated the FHAA and the Rehabilitation Act.[1]

---

[1] Sanders phrases part of his first argument as: "The trial court erred by granting a judgment of possession when the undisputed evidence showed that [AHEPA] had not engaged in the required process after [Sanders] requested a reasonable accommodation for his disability." Appellant's Br. p. 13. However, the interactive process Sanders refers to does not apply to the FHAA. The statutory language of the FHAA prohibits failing to make reasonable accommodations, not failing to interactively engage. *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1192-94 (9th Cir. 2021) (where disabled tenant asserted that FHAA imposes standalone liability on landlord when it fails to engage in interactive process with tenant, court explained that FHAA does not

II. Whether the trial court erred by concluding Sanders materially violated his lease.

## Facts and Procedural History

[3] AHEPA participates in a federally subsidized housing program that provides supportive housing for the elderly under Section 202 of the Housing Act of 1959. In 2009, Sanders' housing application was accepted, and he signed a lease to reside in one of the units at AHEPA.

[4] In February 2022, AHEPA sent a Notice of Lease Agreement Violation to Sanders. The notice recapped that during the prior month management had noticed a urine odor coming from Sanders' unit and had directed its service coordinator to offer him assistance. The service coordinator reported that Sanders informed her he already had a house cleaner in place. The notice further stated that management was recently again in Sanders' hallway and "could smell the urine coming from [his] unit taking over the entire 2nd floor." Ex. Vol. 1, p. 16. The notice then informed Sanders that the violation was a material noncompliance with his lease terms to keep the premises in a clean and sanitary condition and directed him to remedy the problem by February 24. *Id.*

refer to interactive process; rather, statutory language of ADA makes interactive process necessary in *employment* context, but in statutory language in context of public accommodations (i.e., FHAA), interactive process is neither required nor applicable and therefore court held there is no independent basis of liability under FHAA for landlord's failure to engage in interactive process with tenant).

On April 26, 2022, AHEPA sent Sanders a second Notice of Lease Agreement Violation. This notice informed Sanders that management had received many complaints from neighbors as well as the maintenance technician regarding the odor coming from his unit. Angela Williams, the property manager, stated she had gone to the building and noted "the smell has taken over the hallway." *Id.* at 17. The notice advised Sanders that the violation was a material noncompliance with his lease agreement to keep the premises in a clean and sanitary condition and directed that it be remedied immediately. *Id.*

Six months later on October 25, 2022, Williams sent Sanders a letter stating:

> Mr. Sanders I am writing this as a courtesy because if you receive one more lease violation you will have to leave the building. I am still receiving complaints about the urine smell coming from your unit going into the hallway, from residents, maintenance, and pest control. I just walked the hall, and their complaints are valid. It is very important that you take care of your unit immediately and that it is kept clean going forward and doesn't revert back.
>
> Mr. Sanders this is my final attempt to avoid issuing you a 3rd lease violation. Please do whatever is needed to make sure your unit stays in compliance with HUD standards.

*Id.* at 18.

On November 9, AHEPA management performed its semi-annual unit inspection of Sanders' apartment and issued its report concluding that his apartment failed the inspection due to housekeeping. *Id.* at 19. Sanders was

advised that his unit would be reinspected in fourteen days and, if the issue was not corrected, it would constitute a lease violation. *Id.*

[8] On January 20, 2023, AHEPA issued a third Notice of Lease Agreement Violation to Sanders. The notice outlined that on January 9 the property manager accompanied a maintenance technician to Sanders' apartment for an unrelated repair. As soon as they exited the elevator on Sanders' floor, the property manager "could smell urine that got progressively worse" as they walked to Sanders' door. *Id.* at 21. The notice recapped that the property manager had asked Sanders if he was still taking steps to eliminate the odor because it seemed to be worse. *Id.* Sanders responded in the affirmative, and the property manager advised him she was unsure what steps were available beyond those already taken. The property manager had previously referred him to the service coordinator for assistance, provided him contact information for housekeepers, and spoken with his sister. *Id.* The notice advised Sanders that, due to the violation, he was in material noncompliance with his lease for not keeping his unit in a clean and sanitary condition and that it was his final notice. *Id.*

[9] Also on January 20, AHEPA's attorney sent Sanders a Notice to Cure advising Sanders to resolve the odor issue by January 27. *Id.* at 20. The letter also stated that AHEPA would reinspect Sanders' unit after January 27 to determine his compliance. *Id.* The issue was not resolved, and, on January 31, AHEPA's attorney sent Sanders a 30 Day Notice to Vacate by March 2. *Id.* at 22.

Williams later extended this deadline into April as a courtesy because she "saw [Sanders] was trying." Tr. Vol. 2, p. 14.

[10] Sanders then obtained counsel who emailed AHEPA's attorney on March 21, 2023, denying that any unsanitary conditions existed and claiming that if such conditions did exist, they were the result of Sanders' disability. Ex. Vol. 1, p. 25. Sanders' counsel stated that Sanders suffered from "incontinence and digestive issues" and was under a doctor's care for those conditions. *Id.* The email further stated that Sanders had "a handicap as defined by the Fair Housing Act" and requested that AHEPA "make reasonable accommodations in order to allow him to remain in his unit[.]" *Id.* Specifically, Sanders and his counsel requested that AHEPA (1) "[p]rovide available housekeeping services to assist him with hygienic concerns in relation to his condition"; (2) "[r]emove any carpeting from the unit and replace with some kind of laminate-type flooring that is easier to clean and does not retain odor as easily"; and (3) "[d]o not terminate Mr. Sander's [sic] lease or evict him, unless and until the above reasonable accommodations are implemented." *Id.*

[11] In the meantime, AHEPA received a written complaint from a resident that lived next door to Sanders. The complaint, dated April 3, 2023, stated that the "extremely strong odor of urine" in the hallway was noticeable "as soon as you stepped off the elevator" and that her visitors and other tenants had commented on it. *Id.* at 23. She also informed management that she purchased plug-in air fresheners for the hallway to eliminate as much of the odor as possible. *Id.* However, the air fresheners did not solve the problem. Tr. Vol. 2, p. 7.

Thereafter, AHEPA filed a Notice of Claim for Eviction on April 5, and an eviction hearing was held on April 26. Williams testified on behalf of AHEPA that the urine odor from Sanders' apartment had seeped "into the entire hallway" and "in the stairwell." *Id.* at 3. She recounted one of the last inspections she and the maintenance staff conducted on the unit, stating that they "could barely go in, it was so bad" and that their "feet would stick to the floor." *Id.* Williams also indicated that the management office had received numerous complaints from residents who lived on the same side of the building as Sanders and that the urine odor is "in the walls, it's everywhere to where the whole apartment will have to be gutted and redone." *Id.* at 13, 27, 3-4. Williams further testified that when Sanders came to her office recently, he "left a smell." *Id.* at 8. Counsel then questioned Williams:

> Q    Do you have anything against this tenant?
>
> A    I don't. I love all my tenants. This was the first time I've actually spoken freely. Normally I try to cover it up to – not cover it up, but just make it not so bad, not sound so bad. Like I don't want to embarrass him, he's a good person. It's not – nothing I can do, I'm sorry.
>
> Q    Have you had your service coordinator try and assist him to find housing?
>
> A    I have.
>
> Q    Did he participate in those services?

A    He did.

Q    And have you tried to do everything you can to resolve this?

A    We've done everything, including the letter that I sent in between the two lease violations. I just came up with that because I didn't want to give him a third one. It was just a courtesy, I've just been trying. He's had a number of service coordination referrals even to other service coordinators when I first got there – it's been almost two years – for the same issue.

*Id.* at 8-9.

[13]    Sanders testified on his own behalf and stated that he paid to have his carpet cleaned and deodorized in December 2022. He also testified that he had washed all the walls and woodwork with disinfectant three times and that he threw out his mattress. The court determined Sanders was in violation of the lease and granted the eviction. Sanders now appeals.

## Discussion and Decision

[14]    We review small claims judgments for clear error, except questions of law which we review de novo. *Muldowney v. Lincoln Park, LLC*, 83 N.E.3d 130, 132 (Ind. Ct. App. 2017). Although small claims trials should be informal, *see* Indiana Small Claims Rule 8(A), each party to a small claims action still has the burden of proof for its claim or counterclaim and is responsible for bringing evidence to court that is sufficient to sustain that burden. *Muldowney*, 83 N.E.3d at 132.

# I. Violation of Fair Housing Amendments Act and Rehabilitation Act

## A. The Statutes at Issue

[15] The Fair Housing Act (FHA) was passed in 1968 to provide for fair housing across the country. *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018) (quoting *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002)). To enforce its goal of non-discrimination in housing, the FHA originally prohibited discrimination only on the basis of race, color, religion, or national origin, but the Fair Housing Amendments Act of 1988 extended its protection to persons with disabilities. *See* Pub. L. No. 100-430, 102 Stat. 1619. To that end, the FHAA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1) (using term "handicap" while other federal statutes use term "disability").

[16] Similarly prohibiting discrimination based on a disability, Section 504 of the Rehabilitation Act of 1973 applies only to programs that receive federal funding. Although more narrowly tailored, this Act is a predecessor to the Americans with Disabilities Act. The Act "constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap." *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277, 1285 (7th Cir. 1977). Specifically, the Rehabilitation Act provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from

the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

## B. Analysis

[17] Sanders contends the eviction order is unlawful because AHEPA failed to make reasonable accommodations for his disability as required by both the FHAA and the Rehabilitation Act. AHEPA counters that Sanders failed to show he is disabled within the meaning of the FHAA and the Rehabilitation Act in order to trigger the protections afforded by these acts.

[18] To prevail on a claim under the FHAA that a housing provider refused to reasonably accommodate a disability,[2] a plaintiff must establish that (1) he is disabled within the meaning of the FHAA; (2) he requested a reasonable accommodation for such disability; (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling; and (4) the defendant refused to make the requested accommodation. *Furbee v. Wilson*, 144 N.E.3d 801, 806 (Ind. Ct. App. 2020); 42 U.S.C. § 3604(f)(3)(B).

---

[2] Although the FHAA refers to discrimination based on "handicap" while the Rehabilitation Act and other federal statutes use the term "disability," the definition of the terms is substantively the same. *See* 42 U.S.C. § 3602(h), 29 U.S.C. § 705(9)(B), 42 U.S.C. § 12102(2). For that reason, courts have used the terms interchangeably. However, we remain mindful that the preferred term is "disability." *See Furbee v. Wilson*, 144 N.E.3d 801, 806 n.6 (Ind. Ct. App. 2020) (recognizing that disability scholars generally prefer term "disability").

[19]     A person is considered disabled, and thereby protected under the FHAA, if he or she (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 3602(h). The United States Supreme Court has devised a three-part test for determining whether an individual is "disabled." *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 449 (7th Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)). First, we determine whether the person suffers from a physical or mental impairment. *Id.* If so, we next determine whether the affected major life activity claimed by the individual constitutes a major life activity under the FHAA. *See id.* And finally, we analyze whether the person's impairment substantially limited that major life activity. *Id.*

[20]     Here, Sanders established that he suffers from an incontinence problem. He testified at the eviction hearing that the issue had been going on for several years and that he had a new doctor who had given him medication to try to resolve the problem. Tr. Vol. 2, pp. 15-16. Sanders offered neither medical records nor expert medical testimony to support his claim. We will assume for our analysis here that Sanders' problem qualifies as a physical impairment.

[21]     Next, we examine the alleged major life activity that is affected by Sanders' impairment. "Major life activities" are defined as "'[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and

working.'" *Knox Cnty. Ass'n for Retarded Citizens, Inc. v. Davis*, 100 N.E.3d 291, 298 (Ind. Ct. App. 2018) (quoting 29 C.F.R. § 1630.2(i)(1)(i) (2012)), *aff'd on reh'g*. While this list is illustrative rather than exhaustive, *Furnish*, 270 F.3d at 449, Sanders has not identified any major life activity that was affected by his impairment.

[22] Notably, Sanders was quite physically capable despite his impairment. He testified that he lives alone and that, in an attempt to rid his apartment of the strong urine smell, he "personally washed . . . all the walls and woodwork in the apartment with disinfectant . . . three times." Tr. Vol. 2, p. 16. Further, he is able to maintain employment, as he testified that he has worked at Kohl's department store for over fifteen years. *Id.* at 17. Only when the impact of an impairment substantially limits a major life activity, such as working, is an individual considered disabled within the meaning of the FHAA. *Furnish*, 270 F.3d at 450. In sum, while Sanders' incontinence may qualify as a physical impairment, he did not fulfill his burden of showing that it rises to the level of a disability as defined by the FHAA because it does not substantially limit a major life activity. *See Jones v. Hous. Auth. of City of S. Bend*, 915 N.E.2d 490, 495 (Ind. Ct. App. 2009) (stating that although tenant had physical impairment as defined under ADA and Rehabilitation Act, he also was required to show that such impairment limited one or more of his major life activities to be considered disabled), *trans. denied*; *see also Furnish*, 270 F.3d at 450 (where plaintiff established Hepatitis B—chronic illness affecting functioning of major organ—constituted physical impairment, yet never asserted impairment

substantially limited working or any other major life activity, court determined plaintiff not disabled under ADA).

[23] Moreover, we need not conduct a separate analysis of Sanders' claim under the Rehabilitation Act because "'the same analysis generally applies'" for claims brought under both the FHAA and the Rehabilitation Act. *New Horizons Rehab., Inc. v. State*, 400 F. Supp. 3d 751, 759 (S.D. Ind. 2019) (quoting *Valencia*, 883 F.3d at 967). Therefore, Sanders' Rehabilitation Act claim fails for the same reason as his FHAA claim.[3]

## II. Violation of Lease

[24] Sanders next claims the trial court erred in ordering his eviction because AHEPA did not establish his material noncompliance with the lease as required to terminate the agreement.

[25] Sanders' lease provided that AHEPA could terminate the agreement upon material noncompliance with its terms. The lease defined "material noncompliance" as: (1) one or more substantial violations of the lease, (2) repeated minor violations of the lease which disrupt the livability of the building, adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related building

---

[3] Sanders makes an allegation that "free housecleaning services were an option through [AHEPA]" about which he was unaware "until a few weeks before trial." Appellant's Br. p. 8. We make no determination on whether these services were available and, if so, whether their availability was concealed from Sanders because such a service would be an accommodation once a disability was established, and Sanders did not meet his burden of showing he was disabled.

facilities, interfere with the management of the building, or have an adverse financial effect on the building. Ex. Vol. 1, pp. 4, 5 (Lease ¶¶ 8(b)(1), (d)). By signing the lease, Sanders agreed to "keep the premises in a clean and sanitary condition . . . ." *Id.* at 6-7 (Lease ¶ 13(b)). In addition, AHEPA's Resident Handbook contained a housekeeping requirement that each "resident is responsible for the upkeep of his or her own apartment. Any accumulation of dirt, garbage or slovenly housekeeping is considered a safety hazard and will not be acceptable." *Id.* at 17, 21.

[26] At the eviction hearing, AHEPA's counsel argued that there have been at least three minor violations, that the issue has persisted for fifteen months, and that it has disturbed the livability of the building. Tr. Vol. 2, pp. 30, 28. The court found that Sanders was clearly in violation of the lease and ordered his eviction. This finding is amply supported by the record.

[27] The record reveals the odor issue began some time prior to January 2022. On January 28, 2022, Williams referred Sanders to AHEPA's service coordinator and listed the reason for referral as "[r]eceiving complaints of the hallway smelling of urine again!" Ex. Vol. 1, p. 15. AHEPA's evidence, which included the testimony of Williams and documentation of the repeated lease violation notices issued to Sanders throughout 2022 and into 2023 as well as complaints from other tenants and staff, overwhelmingly established that an intolerable and ongoing urine odor existed in Sanders' unit and permeated to the common areas. This condition thus violated Sanders' obligation to keep his

unit in a clean and sanitary condition and not interfere with the livability of the building.

[28] Although Sanders made attempts at cleaning and deodorizing the apartment, the pervasive, offensive odor remained. Indeed, AHEPA management received the written complaint from Sanders' neighbor in April 2023 establishing that the odor outside Sanders' apartment persisted and was evident just a few weeks before the eviction hearing. Like the trial court and AHEPA's property manager, we are sympathetic to Sanders' physical issues and financial constraints; however, it is clear the unpleasant odor resulted in repeated and ongoing violations of the lease provisions for a period well over a year, thereby disrupting the livability of the building and constituting a material noncompliance with the lease.

## Conclusion

[29] We conclude the trial court did not err by entering a judgment of eviction. Sanders failed to show that he is disabled and thereby protected under the FHAA and/or Rehabilitation Act, and the persistent urine odor emanating from his apartment and infiltrating the common areas of the building constituted a material noncompliance with the terms of the lease agreement.

[30] Affirmed.

Riley, J., and Brown, J., concur.

ATTORNEYS FOR APPELLANT

Cristin L. Just
Indiana Legal Services, Inc.
Merrillville, Indiana

Andrew T. Thomas
Indiana Legal Services, Inc.
Fort Wayne, Indiana

Rachel E. Hogenkamp
Indiana Legal Services, Inc.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Kevin E. Werner
Crown Point, Indiana